Donald McGUIRE, Plaintiff,

v.

LYKES BROS. STEAMSHIP CO., INC.,
Defendant and Third-Party Plaintiff,

and

HANSEN SEAWAY SERVICE,
LTD., Defendant,

v.

ADVANCE BOILER AND TANK COM-
PANY, Third-Party Defendant.

Civ. A. No. 76–C–85.

United States District Court,
E. D. Wisconsin.

April 14, 1980, Nunc Pro Tunc
April 9, 1979.

[Content redacted]

John C. Sands, Chicago, Ill., and David M. Quale, Milwaukee, Wis., for plaintiff.

Ben G. Slater, Milwaukee, Wis., for defendant and third-party plaintiff, Lykes Bros. S.S. Co., Inc.

Harney B. Stover, Jr., Milwaukee, Wis., for defendant, Hansen Seaway Service, Ltd.

Stanley F. Schellinger, Milwaukee, Wis., for third-party defendant, Advance Boiler and Tank Co.

## DECISION AND ORDER

REYNOLDS, Chief Judge.

This is a maritime personal injury action arising under 33 U.S.C. §§ 901–905. The injury occurred on a vessel moored at the heavy-lift dock along the Kinnikinnic Basin of the Kinnikinnic River inside of Jones Island at the Port of Milwaukee, and is therefore within the admiralty and maritime jurisdiction of the United States.

The Plaintiff, Donald McGuire, was injured on October 8, 1975, when he fell from a ladder into the hold of a ship on which he was engaged in lashing cargo. The Defendant, Lykes Bros. Steamship Co., Inc., ("Lykes") is the owner of the ship in question. The Defendant Hansen Seaway Service, Ltd., ("Hansen") is a stevedore company hired by the Defendant Lykes to load cargo aboard the ship. Third-party Defendant Dawes Rigging and Crane Service, Inc., ("Dawes"), Plaintiff's employer, was hired by Hansen to assist in lashing the cargo. The additional Third-Party Defendant Advance Boiler and Tank Company, ("Advance") was hired by Lykes to make repairs aboard the ship and was engaged in doing so at the time of the accident.

## FINDINGS OF FACT

The Plaintiff was thirty-seven years of age when he sustained the injury described in this action. He is married and the father of five children.

Since leaving the tenth grade of high school, Plaintiff has been an industrial worker. During his teens he worked in a foundry as a gas welder, worked for an aluminum window manufacturing company, drove a truck for an excavator, and did manual self-employed work such as wood cutting and driveway painting. After a period of unemployment, the Plaintiff in January, 1960 began to work for American Motors Company in Milwaukee as a spot welder and later as a floater on the assembly line. He was employed by American Motors Company until 1962, and during that time also obtained a permit for iron working, and later specialized in structural and sheeting iron working.

In 1964, Plaintiff began to work full-time as a highly skilled iron worker, primarily in the structural field. For the next four or five years he worked as an iron worker on buildings and on bridge construction. From 1970 to 1974, in addition to his regular employment as an iron worker, the Plaintiff on his days off worked for a company in the business of laying industrial flooring.

Beginning in about 1972, the Plaintiff became involved in the machinery moving aspect of iron working, including the lashing, blocking and rigging of ships and cargo and in equipment moved by railroads. In 1974 and 1975, Plaintiff's primary employer was Dawes. In 1974, he worked for Dawes for a period of five to five and one-half months as a second shift foreman at a plant in Milwaukee and earned approximately $28,000.00 for five months work. In 1975, Plaintiff did not work from January through March, but did work from April through October 8, 1975, the date of the injury involved in this lawsuit. From 1972 until the date of his injury, Plaintiff had an unusual work pattern in that he would take longer than normal vacations, but when he did work he would work substantial amounts of overtime and would usually work at least two jobs during any given period of time.

In 1972, Plaintiff's income tax returns indicate that he earned $11,500.00; in 1973 approximately $24,000.00; in 1974 approximately $32,734.00. From January, 1975 to October 8, 1975, he had earned approximately $13,000.00. In the years prior to 1972, the Plaintiff had a substantially lower income.

On October 8, 1975, the Plaintiff was employed by Dawes and on that day was sent with a crew of approximately five other men to assist Hansen in lashing and

blocking cargo aboard the SS JEAN LYKES then docked in Milwaukee.

Lykes is a shipping company with its principal offices in New Orleans, Louisiana, and owns a large number of cargo ships, including the SS JEAN LYKES, which sail throughout the world. On October 2, 1975, the JEAN LYKES was docked in Cleveland, Ohio, on her return trip from the Mediterranean and Canada. While docked in Cleveland, a Port Engineer, Joseph Carriere, an employee of Lykes, went aboard the vessel. Carriere discussed necessary repairs with the Chief Engineer of the ship, obtained a list of such repairs and discussed with the engineer what repairs should be made and how the co-ordination of the biennial Coast Guard inspection of the ship was to be conducted in Milwaukee. The repairs were not made in Cleveland since the ship was loaded with cargo and it had been arranged that the repairs were to be undertaken in Milwaukee. Carriere did not travel with the ship to Milwaukee, but was in Milwaukee on October 7, 1975 when the ship arrived there.

On the morning of October 7, the ship docked in Milwaukee. During the day, Hansen was engaged to unload and did begin the unloading of cargo from the vessel. No employees of Dawes were on the ship that day. During that same day, a Lieut. John D. Koski of the United States Coast Guard was on board the vessel to conduct the bi-ennial inspection during which he was accompanied at various times by Carriere and two officers of the JEAN LYKES. During the course of his inspection of Hatch No. 2, accompanied by Carriere, Lieut. Koski discovered that the port, aft, lower 'tween deck ladder in Hatch No. 2 was missing all four of its bolts at the top of the ladder. In such a condition, were someone to use the ladder, there was a possibility that it might swing loose at the top. Carriere informed Lieut. Koski that he would have the defect repaired. Additionally, the ladder was known to be defective by at least one of the vessel's officers prior to the ship's arrival in Milwaukee on October 7th.

During the evening of October 7, 1975, the JEAN LYKES was moved from the pier at which she had originally been moored to another pier in Milwaukee which is referred to as the heavy-lift dock at Jones Island. She remained there on October 8, 1975.

Hansen, at the time of the accident, was engaged in the stevedoring business. Pursuant to its contract with Lykes, on October 7th Hansen had sent a gang of longshoremen to the JEAN LYKES to unload cargo and to clean out the holds of the ship in preparation for the loading of a new cargo. The foreman of the Hansen cleaning gang was Dudley Griffen. Griffen's supervisor was Nick Gagliano and among the members of Hansen's crew were Roger Ward, Jr. and Phillip Moreland.

The Hansen crew worked in several areas of the ship and on the afternoon of October 7th they moved to Hatch No. 2 to commence their clean-up operation. Ward was the first Hansen employee to descend into the hold and he chose the port aft ladder to descend. It was a normal and customary practice for longshoremen to use the interior hold ladders to ascend and descend as they worked in the ship. When he got part-way down the port, aft, 'tween deck ladder, Ward realized that the ladder was in a defective condition. He therefore slid down the side of the ladder the remainder of the way to the lower 'tween deck in a fireman-like style. Having descended, he informed the rest of the Hansen crew that the ladder was defective and that they should not use it. Ward told Moreland to notify Griffen that the ladder should be blocked off from further use. After he got Ward's message, Griffen examined the port, aft, 'tween deck ladder and noted that its four bolts were missing from the top, that one of the metal plates which attached the ladder to the side deck had been sheared off, but that the ladder was secure at the bottom. Griffen notified someone he assumed to be a member of the ship's crew about the ladder but he did not tell his Hansen supervisor, Gagliano, since he thought repairs were being undertaken on the ship's ladders that same afternoon, and he further assumed that the ship's employee whom he had notified would properly take

**1378**

care of the problem. Griffen did not post any warning signs around the ladder. The Hansen employees then on the ship were notified by word of mouth not to use the ladder.

It should be pointed out that the ladder in question was recessed between each deck so that it was not possible for one looking down from above into the hold to determine whether or not it was properly bolted to the side.

The next day, October 8th, while the Hansen crew was already working in hold No. 2, Joe West, a Hansen longshoreman, was going to use the port, aft ladder to descend from the upper 'tween deck into the hold of the ship. When he approached the ladder to descend, a Hansen employee named Alan Seuss was standing near the ladder and told West that it was defective and that he should not use it. West could not see any defects in the ladder, but when he reached up and grabbed it, the ladder swung out some slight distance from the top. West did not notify Peter Kalil, that gang's foreman, or Ward concerning the ladder since they were already in the hold of Hatch No. 2 and he assumed that they therefore knew about the ladder. West also observed several bolts and a hammer lying near the ladder and he assumed that the ladder was then under repair. He then proceeded down into the hold by means of another ladder and went to work.

Advance is a Milwaukee company engaged in the business of ship repair. On October 7, 1975, Advance had sent a crew of men under the supervision of a foreman, Guy Moede, to make repairs on the JEAN LYKES. The crew was given a list of repairs to undertake by the Port Engineer, Carriere, and was kept overtime on October 7th by Carriere to complete the repairs, which it did. The lower 'tween deck, port, aft ladder, the one involved in this action, was not among the items listed on the repair list of October 7th.

On October 8, 1975, a crew from Advance returned to the ship at her new location to make additional repairs, including some repairs that had not been included on the written list provided by Carriere the day

before, but which he at that time informed them of orally. The lower 'tween deck, port, aft ladder was not among the items of repair mentioned to Advance and Advance was not, on the morning of October 8th, working at or near Hatch No. 2 of the ship. Sometime after Plaintiff's injury occurred, however, Carriere notified Advance about the defective lower 'tween deck, port, aft ladder in Hatch No. 2. Neither Advance nor the vessel itself posted any warning signs at or near the defective ladder, although both parties had or were supposed to have had such warning signs available to them.

Dawes was hired by Hansen as a subcontractor to assist in lashing and blocking cargo aboard the JEAN LYKES on October 8, 1975. The crew which Dawes sent over to the vessel arrived at approximately 8 a.m. and consisted of Thomas R. Plese, the foreman, and approximately five or six gang members including the Plaintiff and his working partner, Allan J. Kremel. After the morning break, the Dawes employees proceeded to Hatch No. 2.

Plese descended into the Hatch by the forward, starboard ladder and noticed that a rung of that ladder was twisted. He looked at the port, aft ladder, which was across the Hatch, and it appeared to be in good condition, because by that time the ladder was straight up and down and did not show any outward signs, as far as Plese could see, of being defective. He directed the other Dawes employees to descend into the hold by that port, aft ladder. Plaintiff was the first Dawes employee to descend into the hold after Plese, and he began to descend by means of the port, aft ladder. As Plaintiff, who at the time of the accident was approximately six feet tall and weighed 220 pounds, was at the position where he had his hands on the top rung of the lower 'tween deck, port, aft ladder, the ladder swung out from the top since, as mentioned, the four top bolts and the one top plate were missing. The ladder swung out approximately twenty to twenty-four inches and stopped suddenly because of the manner in which it was anchored at the bottom. Plaintiff lost his grip on the lad-

der and was thrown approximately twenty-five feet to the bottom of the hold where he glanced off of Joe West, a Hansen employee, who was working in the hold and after that struck the bottom of the hold.

As a result of the accident, Plaintiff suffered a fracture of the left kneecap, patella, numerous abrasions, a slight injury to his neck and back, and smashed his left and right wrists and his left hand. More specifically, his wrist and hand injuries are described as follows: a fracture dislocation of his left and right wrists, fracture dislocation of the fourth and fifth metacarpals, and various knuckles of his left hand, and minor and lesser injuries to his right hand. Plaintiff had several casts put on him and when the casts were removed he commenced therapy sessions to increase the mobility in his hands and wrists and still continues to receive such therapy.

In September, 1977, surgery was performed on Plaintiff's right arm and a portion of the lower ulna was removed to increase the mobility of his right wrist. While the operation resulted in greater mobility of his right hand, it was not an overwhelming success, and in exchange for the mobility that the Plaintiff received because of the operation, he has had to give up and has lost strength in his right hand and it has increased the pain in his right arm. Generally speaking, the Plaintiff's condition is such that he almost always has to choose between either pain or motion. He cannot have motion without pain.

Plaintiff's right hand has healed fairly well and he is able to extend the fingers of that hand and to make a fist and to write. Plaintiff's left hand has not healed well at all. The muscles of the hand have shortened causing his hand to become claw-like. He cannot make a fist and he suffers substantial deformity and pain in the left hand. Plaintiff's left wrist also continues to have decreased mobility and to cause him great pain.

In 1978, as a result of the hunching over that he must engage in to compensate for the lack of mobility in his arms and hands, Plaintiff apparently developed neck and back aches for which he is being treated by a doctor and for which he engages in a program of exercise and therapy at home. Also, as a result of the accident of October 8, 1975, Plaintiff suffers from traumatic arthritis in both wrists which is becoming progressively worse.

█ Although the Plaintiff still has his hands in a physical sense, they are useless. The Plaintiff is 100% industrially disabled, although he is physically able to perform non-industrial, sedentary work which does not require extensive use of the hands and which conceivably could be performed while he is in pain, if such work can be found. The record which was made before this Court does not indicate that such work exists for him and it appears to be speculation for the Court to assume such work does, in fact, exist. It is true that Plaintiff can write and can drive for short distances, but Plaintiff's background, training and past employment history are all in the field of heavy, industrial work and in iron working. He is not trained for sedentary, non-industrial work and he is, to an undetermined but realistic extent, incapacitated for any type of work by the pain which he suffers as a result of this accident. No showing has been made that the Plaintiff would be able to obtain employment in this community or in any other place in any capacity.

## CONCLUSIONS OF LAW

█ The Court finds that the Plaintiff was in no way negligent in regard to the accident which occurred on October 8, 1975. The defects existing in the lower 'tween deck, port aft ladder in Hatch No. 2 of the SS JEAN LYKES on October 8, 1975, consisting of the missing four top bolts and the sheared off top plate, were latent defects on that day because the ladder was in an upright position, was not apparently out of place, and the defects could not be seen by a cursory examination.

█ Thomas Plese, the foreman in charge of the Dawes crew on the JEAN LYKES on October 8, 1975, conducted a sufficient visual examination of Hatch No. 2 on the morning of that date, and did not detect any defects in the lower 'tween deck,

port, aft ladder and, of course, did not see any warning signs since none had been posted. Since Plese conducted a sufficient examination, Dawes may in no way be held responsible for the accident which occurred to Plaintiff aboard the vessel that day.

Lykes Bros. Steamship Company had actual knowledge on October 7, 1975, of the defects in the lower 'tween deck, port, aft ladder in Hatch No. 2 of the SS JEAN LYKES. On October 7, 1975, a Lykes employee informed Coast Guard Lieut. Koski that the ladder was under repair and the defects would be remedied. Nevertheless, Lykes made no effort to repair the ladder and made no effort even to warn anyone including the longshoremen then aboard the ship about the defect in the ladder and did not post a sign on the ladder indicating that it should not be used. On October 8, 1975, Lykes made no effort to repair the known defects in the ladder, to give warning of such known defect in the ladder to anyone on the ship, or to prevent persons from using the ladder which it knew to be defective until after the accident to Plaintiff had occurred.

Under the Longshoremen's and Harbor Workers' Compensation Act ("LHWCA") and the law applicable thereto, the vessel (ship and shipowner) is liable for injuries caused by defects of which it had actual knowledge and as to which it made no effort to prevent an accident by way of remedying the defect or posting a warning at or near such defect when it should reasonably have foreseen that such defect could cause injury to a person. *Lopez v. A/S D/S Svendborg*, 581 F.2d 319, 324 (2d Cir. 1978); *Napoli v. Hellenic Lines Ltd.*, 536 F.2d 505 (2d Cir. 1976); *Pastorello v. Koninklijke Nederl Stoomb Maats*, 456 F.Supp. 882, 889 (E.D.N.Y.1978); *Gallardo v. Westfal—Larsen & Co. A/S*, 435 F.Supp. 484 (N.D.Cal.1977); *Garza v. Costa Armatori S. P. A.*, 1977 A.M.C. 1672, 1674 (S.D.Tex. 1977); *Slaughter v. Ronde*, 390 F.Supp. 637, 641 (S.D.Ga.1974), aff'd 509 F.2d 973 (5th Cir. 1975) *(per curiam)*.

The lower 'tween deck, port, aft ladder in Hatch No. 2 of the SS JEAN LYKES, as indicated above, was recessed at the top in such a manner that a person descending the ladder would not be aware of any defects existing at the top of such ladder. Therefore, the vessel could reasonably foresee that, on October 8, 1975, such condition of the ladder could cause injury to a person if he were to descend into the hold by means of that ladder. That Lykes did in fact foresee that the defect could cause an injury is indicated by the fact that it told Lieut. Koski that it was going to take steps to have it repaired as soon as possible. But it took no steps to repair it. It took no steps even to post a warning indicating that the ladder was in a defective condition.

Under the LHWCA a stevedore is liable for injuries to third persons not in its employ which occur in areas of the vessel over which it has actual control when the injuries result from defects of which the stevedore has actual knowledge and when the stevedore has reason to believe that repairs of such defect will not shortly be made and has reason to know that no warning by the vessel has been given to other persons concerning the existence of such a defect. Lykes was negligent and its negligence was the primary cause of the accident and resultant injuries sustained by the Plaintiff. *Rich v. United States Lines, Inc.*, 596 F.2d 541, 554 (3d Cir. 1979); *Lamar v. Admiral Shipping Corp.*, 476 F.2d 300, 302 (5th Cir. 1973); *Delaneuville v. Simonsen*, 437 F.2d 597, 601 (5th Cir. 1971); *Atlantic & Gulf Stevedores, Inc. v. Skibs A/S Danmotor*, 342 F.Supp. 837, 844 (S.D.Tex.1971); *Nordeutsher Lloyd, Brennan v. Brady-Hamilton Stevedore Co.*, 195 F.Supp. 680, 683 (D.Ore.1961). Under such circumstances, the stevedore has a duty to warn third-persons of the existence of such a defect and to take steps to prevent them from being injured as a result of the defective condition. On October 7, 1975, Hansen had actual knowledge of the existence of the missing bolts and sheared off plate on the lower 'tween deck of the port, aft ladder in Hatch No. 2 of the SS JEAN LYKES. Similarly, on October 8, 1975, one of Hansen's employees, Joe West, had actual knowledge of the defect. Hansen was working in the hold on the morning of

October 8 and Hansen, through West, knew no repairs were being made to the ladder at that time. Hansen knew no warning signs had been posted at or near the defective ladder. However, Hansen made no effort to warn other persons in the hold that the ladder was in a defective condition, and, consequently Hansen was negligent in regard to the ladder and its negligence contributed to the injury which Plaintiff sustained.

 Under the LHWCA, a ship repair company may be held liable for injuries which occurred in an area over which it had control and where it failed to make repairs in a timely manner of defects of which it had notice and as to which it had a duty to repair. Similarly, a repair company may be held liable if it fails to prevent persons from using such defective equipment until such time as repairs have been sufficiently made to remedy the defects of which it has notice and as to which it has a duty to repair. *Lamar v. Admiral Shipping Corp.*, 476 F.2d 300, 302 (5th Cir. 1973); *Vaccaro v. Alcoa S. S. Co., Inc.*, 405 F.2d 1133, 1138 (2d Cir. 1968); *Alcoa S. S. Co., Inc. v. Charles Ferran & Co.*, 383 F.2d 46, 50 (5th Cir. 1967), *cert. denied*, 393 U.S. 836, 89 S.Ct. 111, 21 L.Ed.2d 107 (1968); *Gallardo v. Westfal—Larsen & Co., A/S*, 435 F.Supp. 484, 496 (N.D.Cal.1977); *Ferrigno v. Ocean Transport, Ltd.*, 201 F.Supp. 173, 184 (S.D. N.Y.1961), *rev'd on other grounds*, 309 F.2d 445 (2d Cir. 1962); *Hershey Chocolate Corp. v. The S. S. Robert Luckenbach*, 184 F.Supp. 134, 140–41 (D.Ore.1960), *aff'd*, 295 F.2d 619 (9th Cir. 1961). However, a repair company has no duty to search out and repair defective conditions. Its duties are limited to those items it has been requested to repair and those defects of which it has knowledge and which occur in areas under its control. On October 8, 1975, Advance had not been requested prior to the time of the accident to repair the lower 'tween deck, port, aft ladder in Hatch No. 2. It was not engaged in working at or about the ladder, and it was under no duty to either repair that ladder or to warn persons against using such ladder. The Court finds that Advance was not negligent in any manner and was not responsible in any de-

gree for the injury which occurred to Plaintiff.

 Under the 1972 amendments to the LHWCA, liability among the vessel, the injured longshoreman and other parties on the vessel, is apportioned according to fault on a true comparative basis. *United States v. Reliable Transfer Co., Inc.*, 421 U.S. 397, 411 (1975); *Pope & Talbot, Inc. v. Hawn*, 346 U.S. 406, 408–09, 73 S.Ct. 1129, 97 L.Ed. 1398 (1953); *The Max Morris*, 137 U.S. 1, 11 S.Ct. 29, 34 L.Ed. 586 (1890); *Lopez v. A/S D/S Svendborg*, 581 F.2d 319, 322 (2d Cir. 1978); *Gay v. Ocean Transport & Trading, Ltd.*, 546 F.2d 1233, 1238 (5th Cir. 1977); *Ahlgren v. Red Star Towing & Transport Co., Inc.*, 214 F.2d 618, 620–21 (2d Cir. 1954); H.R.Rep. No. 92–1441, 92d Cong., 2d Sess. (1972), *reprinted in* [1972] U.S. Code Cong. & Admin.News, pp. 4698, 4705; Sen. Rep. No. 92–1125 at 12, 92d Cong., 2d Sess. (1972). The Court hereby apportions the fault of those responsible for the damages arising out of the injury which occurred to Plaintiff on October 8, 1975, in the following manner:

| Donald McGuire | 0% |
|---|---|
| Advance | 0% |
| Dawes | 0% |
| Hansen | 5% |
| Lykes | 95% |

The massiveness of the negligence of the vessel shocks the conscience of this Court. That a crew of officers and employees could knowingly permit such a defective trap to exist over a two day period and not even put up a warning sign at or near it, knowing that crews and men were working on the vessel, evidences to this Court a callous disregard for the safety of others. Such a failure to warn of a known defect, with the knowledge that the defective ladder would be used by others, shocks the conscience of this Court. It approaches being almost a wilful tort. This Court is of the opinion that such a deliberate failure to warn is wholly inexcusable and creates such a high degree of risk that it is almost unconscionable.

It is true that Hansen, because of the knowledge which West had, was, as a mat-

ter of law, negligent, but that negligence was almost fleeting in comparison to the quality and substance of the negligence of the vessel. It is for those reasons that the Court has reached the apportionment of fault listed above.

## DAMAGES

The Court must now address the always difficult subject of damages. The parties agree that the Plaintiff's average wage for the four years prior to the injury is $21,-672.00. The only evidence presented to the Court on the issue of damages was by Plaintiff's economist. The figure of $83,-516.00 will be accepted as the figure for Plaintiff's lost past wages. This figure does not reflect the increase in the rate of inflation since the date of the accident. But there is no evidence in the record to support any upward adjustment.

As to the present value of Plaintiff's future earning capacity, the economist testified that the figure should be $629,480.00 which includes an increase of 3% per year for Plaintiff's increased productivity, less 4% to readjust to present value. The figure does not reflect any future inflation and the Court will accept such a figure.

Plaintiff's actuarial life expectancy is 31 years. The question is what figure will compensate him for past pain and suffering, future pain and suffering and his disability as that disability affects his potential to enjoy life for the next 31 years. The Court has searched its conscience and has considered all the relevant factors and concludes that the figure of $750,000.00 will fairly compensate the Plaintiff for his past, present and future pain and suffering, and the loss of enjoyment he has sustained as a result of his disability. The total judgment will therefore be $1,462,996.00.

JUDGMENT AND ORDER ACCORDINGLY.