## WESTERN MARINE & SALVAGE CO. v. BALL.

### No. 4788.

Court of Appeals of District of Columbia.
Argued November 7, 1929. Decided February 4, 1930.

Petition for Rehearing Denied February 21, 1930.

E. C. Brandenburg and Louis M. Denit, both of Washington, D. C., for appellant.

Morris Simon, Lawrence Koenigsberger, Eugene Young, and Selig C. Brez, all of Washington, D. C., for appellee.

Before MARTIN, Chief Justice, and ROBB and VAN ORSDEL, Associate Justices.

VAN ORSDEL, Associate Justice.

Appeal from a judgment of the Supreme Court of the District of Columbia in an action by the appellee, plaintiff below, for personal injuries alleged to have been sustained through the negligence of an employee of defendant company.

It appears that defendant had purchased a number of ships which it was engaged in wrecking in the yard of the Virginia Ship Building Company near Alexandria, Va. One Louis Simon, a man engaged in the iron and steel scrap business, contracted with defendant for the purchase of the iron and steel salvaged from the ships. The material parts of the contract are as follows:

"(1) The Vendor hereby sells to the Vendee and the Vendee hereby purchases from the Vendor all the steel and iron pipe, sheet iron, scrap iron, and scrap steel, removed from the ships dismantled as aforesaid."

"(5) In the performance of this contract, the Vendee, without any charge other than hereinafter specified, may use any of the Vendor's equipment (except on Sundays and Holidays) whenever such equipment may not be required by the Vendor, but such equipment may be used only for the purpose of preparing for the market and loading the material hereby purchased. In the operation of said equipment, the Vendee will pay to the Vendor, on demand, the actual cost of the operation of said equipment, which is hereby fixed at Two Dollars and $^{50}/_{100}$ ($2.50) per hour.

"It is understood and agreed that the breaking of the steel or iron pipe, sheet iron, scrap iron, and scrap steel, and any other preparation of the same for the market, including the loading of said materials on the cars, shall be at the cost and expense of the Vendee, and that the Vendor will have fully complied with its obligation hereunder by delivering the materials at the places above specified in its yard near Alexandria."

The evidence discloses that, in compliance with the contract, the materials were delivered by the defendant to Simon, who received them for the purpose of breaking them and loading them on the cars for shipment. As stated in the contract, with the delivery of the materials in the yard at the places specified, the obligation of defendant vendor ceased. The materials thereupon became the

property of Simon for breaking and shipment. Under the contract, defendant furnished to Simon an electromagnet crane, with the operator, who was an employee of defendant company, to be used in breaking the material. The materials, consisting of "steel or iron pipe, sheet iron, scrap iron, and scrap steel," was placed in position by Simon and his employees to be broken, so that it could conveniently be handled for shipment. The breaking device consisted of a large pearshaped piece of metal, which was picked up by a magnet and raised by the crane about 100 feet in the air. It was then dropped upon the material to be broken. Before dropping the weight, it was the practice of the crane operator to ring a bell. There is evidence that in this instance the bell was not rung. When the pear-shaped piece of metal was released and struck the pile, smashing the metal into small pieces, a piece struck the defendant, an employee of Simon, inflicting the injuries complained of.

The principal question presented, and on which we think the case turns, is whether the crane operator was, at the time the injuries were received, the servant of defendant or of Simon. If he was not the servant of defendant, that is the end of the case, and it is unnecessary to inquire into the other assignments of error on which the appeal is based.

It appears from the testimony of Simon that one Harry Steinbraker was his foreman, and that Simon was only intermittently in attendance at the yard. He testified, however, that "he had seen the crane working on his material a number of times," and that Steinbraker "was in charge of his work." Steinbraker testified that he was foreman for Simon, and that he "gave instructions as to what iron should be broken in the ship yard," and that when he was not present one Gus Marshall, an employee of Simon, "was left there with instructions to tell the crane operator what material to break and what not to break." It thus appears that the work being done was the work of Simon and not the work of defendant company.

This brings us to the consideration of the law of the case. Plaintiff relies chiefly upon the case of Standard Oil Company v. Anderson, 212 U. S. 215, 29 S. Ct. 252, 53 L. Ed. 480, and this is the leading case in this country bearing upon the question of master and servant, under circumstances similar to those here involved. In that case the facts were stated by the court as follows: "The plaintiff was employed as a longshoreman by one Torrence, a master stevedore, who, under contract with the defendant, was engaged in loading the ship Susquehanna with oil. The plaintiff was working in the hold, where, without fault on his part, he was struck and injured by a draft or load of cases containing oil, which was unexpectedly lowered. The ship was alongside a dock belonging to the defendant, and the cases of oil were conveyed from the dock to the hatch by hoisting them from the dock to a point over the hatch, whence they were lowered and guided into the hold. The work was done with great rapidity. The motive power was furnished by a steam winch and drum, and the hoisting and lowering were accomplished by means of a tackle, guy rope, and hoisting rope. The tackle and ropes were furnished and rigged by the stevedore, and the winch and drum were owned by the defendant and placed on its dock, some 50 feet distant from the hatch. All the work of loading was done by employees of the stevedore, except the operation of the winch, which was done by a winchman in the general employ of the defendant."

We are at once confronted by the controlling distinction between the Standard Oil Case and the case at bar. There, the oil, dock, ship, and winch, were owned by the oil company. Here everything was under the ownership and control of Simon, except the crane, which belonged to defendant, and was operated by an employee of that company. There the work being done was the work of the Standard Oil Company. Here the work being done was the work of Simon, and not defendant company. There the winch, drum, and operator, were furnished the stevedore at a fixed price. Here the crane and operator were furnished Simon at a stipulated price. The mere fact that defendant reserved in its contract the privilege of using the crane and operator on its work at times when not used by Simon is immaterial. We are concerned with the determination of whose servant the operator of the crane was at the time the crane and operator were engaged on Simon's work, and especially at the time the accident occurred.

In the Standard Oil Case, Mr. Justice Moody, delivering the opinion of the court, distinguishes two very important cases, Murray v. Currie, L. R. 6 C. P. 24, and Rourke v. White Moss Colliery Company, L. R. (1876) 2 C. P. D. 205. In the former case, the defendant was the owner of a ship which was provided with a winch and donkey engine used for loading and unloading cargo. He contracted with a master stevedore to unload the vessel, and, as part of the contract, he was

to furnish him with the winch, the power, and such sailors as the stevedore might need, deducting their wages from the agreed compensation for unloading. The stevedore had control over the sailors, and one of the sailors, while operating the winch, injured the plaintiff, who was in the employ of the stevedore. The action was brought against the owner of the cargo instead of the stevedore.

The court held that the stevedore had entire control over the work, and employed such persons as he thought proper, with the option of using the services of the crew of the ship. The laborers, whether independent or part of the crew, were held to be the servants of the stevedore, and their acts were his acts. In disposing of the case, Brett, J., said: "But I apprehend it to be a true principle of law that, if I lend my servant to a contractor, who is to have the sole control and superintendence of the work contracted for, then the independent contractor is alone liable for any wrongful act done by the servant while so employed. The servant is doing, not my work, but the work of the independent contractor."

In the Rourke Case, the defendant was the owner of a colliery, and had engaged a contractor to sink a shaft. Defendant agreed to provide the contractor with power, ropes, and an engineer to work the engine, with the understanding that the engineer should be under the control of the contractor. In the operation of the engine the engineer was negligent, and the plaintiff, a servant of the contractor, was injured. It was held that the engineer was not the servant of the defendant, but for the time being was the servant of the contractor, and this holding was based upon the fact that the engineer was engaged in doing the work of the contractor and not of the defendant.

Distinguishing these cases, Mr. Justice Moody said: "It should be observed that in each of them it clearly appeared in point of fact that the general servants of the respective defendants had ceased for the time being to be their servants, and had passed under the direction and control of another person, upon whose work they were engaged." The learned Justice then quoted from O'Brien, J., in Higgins v. Western Union Telegraph Company, 156 N. Y. 75, 50 N. E. 500, 66 Am. St. Rep. 537, as follows: "The question is whether, at the time of the accident, he was engaged in doing the defendant's work or the work of the contractor. * * * The master is the person in whose business he is engaged at the time, and who has the right to control and direct his conduct." Many cases are then cited in which this test has been followed.

After consideration of the foregoing cases, and adopting the principle laid down in the Higgins Case, Mr. Justice Moody said: "Let the facts in evidence now be considered in the light of the foregoing principles of law. Was the winchman, at the time he negligently failed to observe the signals, engaged in the work of the master stevedore, under his rightful control, or was he rather engaged in the work of the defendant, under its rightful control? We think that the latter was the true situation. The winchman was, undoubtedly, in the general employ of the defendant, who selected him, paid his wages, and had the right to discharge him for incompetency, misconduct, or any other reason. In order to relieve the defendant from the results of the legal relation of master and servant it must appear that that relation, for the time, had been suspended, and a new like relation between the winchman and the stevedore had been created. The evidence in this case does not warrant the conclusion that this changed relation had come into existence. For reasons satisfactory to it the defendant preferred to do the work of hoisting itself, and received an agreed compensation for it. The power, the winch, the drum, and the winchman were its own. It did not furnish them, but furnished the work they did to the stevedore. That work was done by the defendant, for a price, as its own work, by and through its own instrumentalities and servant, under its own control."

Here the court expressly finds that the winchman was engaged in doing the defendant oil company's "own work, by and through its own instrumentalities and servant, under its own control." But the facts in the present case impel a different conclusion. The master mechanic of defendant company testified that when "I got orders to give Mr. Steinbraker (Simon's foreman) a crane man and a crane to break scrap, I sent him to Mr. Steinbraker to do what he was told to do." With the transfer under this order, the crane operator became an important factor in Simon's force for carrying on his work. Any importance that may be attached to the fact that defendant paid his wages is overcome, not only by its reimbursement by Simon, but by the nature of the relation established between the operator and Simon. When the crane and operator were turned over to Simon, or Simon's foreman, they were converted into his hired agencies for the time being for doing the particular work to which they were as-

signed, subject to his direction and control. These facts seem to meet every condition expressed in the general rule stated in 55 A. L. R. 1263, 1264, as follows: "In determining who is liable for the negligence of a servant in the general employment of one person, but who at the time of the injury complained of was assisting an independent contractor, the proper test seems to be, whose work was being performed, and who had the power to control and direct the servant in the performance of that work."

In the instant case Simon was not even occupying the position of an independent contractor, but he was in the position of the owner of the material being broken, and as such in full control and supervision of the work. It was his own work, and not the work of defendant company. Defendant had parted with ownership of the material, and was no longer concerned with its use or disposition. With this distinction clearly before us, we find no difficulty in reaching the conclusion that the operator of the crane, at the time the accident in question occurred, was the servant of Simon, and was engaged in doing his work.

The motion for a directed verdict should have been allowed, and the case is reversed, with costs, and remanded for further proceedings not inconsistent with this opinion.