Guilford D. WARE, Administrator of the Estate of Eduardo Mazzacane, Deceased, Enrico Mazzacane and Rosa Mazzacane, Libellants,

v.

CIA DE NAVEGACION ANDES, S. A., Lamberts Point Docks, Incorporated, Southern Stevedoring Corporation, and THE Steamship ASTEROPES, Respondents.

No. 7930.

United States District Court
E. D. Virginia,
Norfolk Division.

Feb. 15, 1960.

Baird, Crenshaw & Lanning (Edw. R. Baird) Norfolk, Va., for libellants.

White, Ryan & Reynolds (Allan S. Reynolds) Norfolk, Va., for Lamberts Point Docks.

Vandeventer, Black & Meredith (Hugh S. Meredith) Norfolk, Va., for The Asteropes and owners.

Parsons, Stant, Parsons & Mirman (L. S. Parsons, Jr.) Norfolk, Va., for Southern Stevedoring Corp.

WALTER E. HOFFMAN, District Judge.

By these proceedings libellants seek damages for the death of Eduardo Mazzacane, late a citizen and resident of Italy, who died in the City of Norfolk, Virginia, on June 7, 1957, following an accident which occurred on board the SS Asteropes, a vessel flying the flag of Panama and owned, operated and controlled by the respondent, Cia de Navegacion Andes, S. A., a Panamanian corporation. The decedent was the first mate and chief officer on said vessel and, at the time of the accident, was

in the performance of his duties. He is survived by his father and mother, both of whom were dependent upon the deceased for support, and who have been named libellants herein, but, as the Court views the action, the administrator of decedent's estate is the proper party libellant and he will be referred to as such.

On the night in question the Asteropes was moored to and loading a cargo of scrap at the pier of the respondent, Lamberts Point Docks, Incorporated. The services of the respondent, Southern Stevedoring Corporation, had been engaged by the vessel's agents to act as stevedore in loading the ship. In turn, Southern Stevedoring Corporation arranged with Lamberts Point Docks for the berthing of the vessel, the use of a movable revolver crane affixed to a track on the pier to assist in loading, and the services of a crane operator. During the process of loading, one of Southern Stevedoring's men directed the crane operator to move the pier crane to another hold of the vessel, and in so doing the operator negligently permitted the boom of the crane to strike a portion of the ship's superstructure, thereby knocking off an attached searchlight which fell upon and killed Mazzacane while he was standing on the deck below the superstructure.

Libellant's claim against the vessel and her owners is predicated upon negligence and unseaworthiness. As to Lamberts Point Dock and Southern Stevedoring, libellant alleges negligence and concedes that his right of action is grounded upon the Virginia Wrongful Death Act, Code 1950, § 8–633 et seq. which, at the time of the accident, provided a maximum recovery of $25,000.

The respondents have impleaded each other on the wrongful death action alleging, in each instance, that if liability is imposed upon one, the ultimate burden of payment should be passed on to the other respondents under an implied contract of indemnity. We think it unnecessary, by reason of the conclusions reached, to discuss these several theories.

In a cross-libel filed by the respondent, Cia de Navegacion Andes, S. A., owner of the Asteropes, the cross-libellant seeks to hold Lamberts Point Docks and Southern Stevedoring Corporation responsible for the damage to the vessel caused by the boom of the crane striking the superstructure, and for the necessary funeral and burial expenses incurred by reason of Mazzacane's death, the latter expenses including the cost of shipping the decedent's body to Italy for burial. The cross-libellant also claims interest from the date of payment of these items which, according to the allegations of the cross-libel, are due by reason of the two respondents having impliedly warranted to perform their work in a safe and proper manner.

Lamberts Point Docks leases the pier, equipment and crane from the Norfolk and Western Railway. The pier, equipment, and crane are maintained and operated by Lamberts Point Docks, which holds itself out to the maritime trade as having modern available equipment to load and unload vessels, together with trained personnel to operate the movable revolver crane. It is conceded that the primary function of this corporation is to operate its piers and to rent cranes and operators to parties requiring same in loading and unloading. Lamberts Point Docks trains its own personnel, including all crane operators, and by reason of the nature and value of the equipment, none other than Lamberts Point Docks' trained employees are permitted to operate the crane. The replacement value of the crane is approximately $250,000 but, by reason of its age and structure, it is insured for only $75,000.

The crane operator is hired and paid by Lamberts Point Docks. When a vessel berths at the pier, for the purpose of loading and unloading, the arrangements are made through the stevedore. With respect to the Asteropes, no specific charge as such was made for docking facilities; the only charge made to the vessel being $20 for four men to handle the lines at the time of docking and for

two men to handle lines when undocking. Included, however, in the services made available to the Asteropes, at the request of Southern Stevedoring, was the rental of a crane and operator at $10 per hour straight time and $12 per hour overtime. Lamberts Point Docks received, by reason of services rendered to the Asteropes through Southern Stevedoring, the sum of $1,164 for the use of its bridge crane and the revolver crane here involved, both cranes having been used a total of 24 hours straight time and 77 hours overtime. Southern Stevedoring received $2.80 per long ton (2,240 lbs.) to load 9,042,460 pounds of scrap metal aboard the Asteropes, at an approximate net profit of ten percent. As previously indicated, the vessel's agents customarily made all arrangements with the stevedore who, in turn, carried on all negotiations with Lamberts Point Docks.

■ As we find no negligence as to the vessel's officers or crew, and no unseaworthiness of the vessel, we do not reach any discussion of damages in excess of the amount provided under the Virginia Wrongful Death statute. Nor must we consider whether the Jones Act, 46 U.S.C.A. § 688 is applicable, although it is apparent that it is not, as there is no suggestion that the vessel is a "flag of convenience."

Libellant's entire case against the vessel and her owners is grounded upon the theory that the area was too well lighted and that the crane operator was blinded while "walking" the crane toward the end of the pier, thus causing the boom of the crane to strike the superstructure. While the evidence does not support the charge of "blinding" lights (as distinguished from "night blindness" that is to be expected when one changes his eyes from a brightly lighted area to one less brilliant), it is clear that the operator had been working on the crane for several hours and was thoroughly aware of the conditions. Furthermore, the crane operator admitted that there was no reason why the boom could not have been raised high enough to extend over the top of the vessel's superstructure, in which event no accident would have occurred. Moreover, the operator conceded that his blindness was no greater than ordinarily experienced in looking up at the boom. He certainly could have looked at the end of the boom prior to moving the crane. The sole proximate cause of the accident and resulting death was the negligence of the crane operator.

This brings us to the main point at issue. Lamberts Point Docks insists that a gangwayman employed by Southern Stevedoring gave signals to the crane operator in the course of the work and, on the night in question, a gangwayman signalled the crane operator to move from the No. 4 hatch to pick up a chute in the No. 3 hatch, and thereafter move the chute to the No. 1 hatch. The chute was owned by Southern Stevedoring. It was while the crane was being "walked" from the No. 4 hatch to the No. 3 hatch that the boom struck the superstructure. For these reasons, Lamberts Point Docks urges that the crane operator was a "loaned servant" to Southern Stevedoring. The Court disagrees.

■ While it is true that Southern Stevedoring had complete charge of the loading operation, prepared or assisted in preparing the loading plan, arranged for the rental of the crane and operator, and generally controlled the overall loading operations, this is not sufficient under the facts of this case to hold that the operator was a "borrowed servant." We are here concerned with a large and valuable piece of equipment operated only by trained personnel of Lamberts Point Docks. In short, to use the revolver crane it was necessary also to use a crane operator trained and employed by Lamberts Point Docks.

The cable running from the generator to the magnet was rigged to the revolver crane by Southern Stevedoring, and the electrical power to the magnet was supplied by this generator. All of this equipment was owned by Southern Stevedoring which, during the performance of its contract, employed approximately nine men on the job.

As to the crane operator, it is Lamberts Point Dock who directed him to operate the crane on his particular shift. Prior to becoming a regular crane operator in February, 1957, the operator whose negligence brought about this fatal accident was employed as an apprentice during 1956. The operator concedes that the method and manner of moving the crane rested solely with him, but that the stevedore instructed him where to go. The operator further testified that the crane was a highly specialized piece of equipment which required an experienced man to operate same. The actual physical operation of the crane remained with the pier operator, and not with the stevedore.

All of the reported authorities relating to the issue of "borrowed servant" discuss the leading case of Standard Oil Co. v. Anderson, 212 U.S. 215, 29 S.Ct. 252, 356, 53 L.Ed. 480, which, incidentally, is very much in point with the factual situation under consideration. There, the winchman obeyed the signals of the gangman, an employee of the stevedore, in timing the raising and lowering of the cases of oil. As to this point the Court said:

> "But when one large general work is undertaken by different persons, doing distinct parts of the same undertaking, there must be co-operation and co-ordination, or there will be chaos. The giving of the signals under the circumstances of this case was not the giving of orders, but of information; and the obedience to those signals showed co-operation rather than subordination, and is not enough to show that there had been a change of masters."

 The pier operator here argues that the instructions to move the crane from one hatch to another constituted the perfect equivalent of an order and, as such, passed the control of the crane and its operator into the hands of the operator. Reliance is placed upon Pearson v. Arlington Dock Co., 111 Wash. 14, 189 P. 559. The "borrowed servant" problem does not exist by virtue of the rule which is well settled, but in its application. The ultimate test is one of control—a matter not readily resolved. That this particular crane operator was in the general employ of Lamberts Point Docks who selected him, trained him, paid his wages, and had the right to discharge him for incompetency, misconduct, or other reasons, cannot be questioned. To remove him from this legal relation as servant of his master, Lamberts Point Docks, it must appear that the relation, for the time, had been suspended and a new like relation with the stevedore created. Standard Oil Co. v. Anderson, supra. While it is fundamental that the master's responsibility cannot be extended beyond the limits of the master's work and if the servant is doing his own work or that of another, the master is not answerable for his negligence, this is not our problem as we have before us the typical situation in which the employee crane operator was furthering the business of his general employer, Lamberts Point Docks, by the service rendered to the stevedore. We recall that the primary function of Lamberts Point Docks is to operate its piers and to rent cranes and operators to parties requiring same. Certainly the action of the crane operator was in furtherance of the business of his general employer. There is no inference of a new relation unless command has been surrendered, and no inference of its surrender from the mere fact that there has been a division of command. Charles v. Barrett, 233 N.Y. 127, 135 N.E. 199, an opinion by Judge Cardozo. The employee remains presumptively in the service of his general employer, and the burden is on such general employer to show that in fact allegiance has been transferred.

 There are additional reasons supporting the view that the crane operator remained in the service of his general employer. Where the equipment furnished by the general employer is large, valuable, and requires specialized training to operate, so that the special employer will do no more than ask for

particular results, the presumption is strong that the general employer remains liable. Such are the implications in Standard Oil Co. v. Anderson, supra. Of more particular interest is Halliburton Oil Well Cementing Co. v. Paulk, 5 Cir., 180 F.2d 79, in which the equipment causing the injury was a specially constructed truck equipped with its pump and connections, squeeze tool and manifold; the latter likewise being a specially constructed device. The "squeeze job" required was a highly specialized operation which necessitated the services of skilled operators. In holding that the alleged special employer was not, and the general employer was, liable for the injuries, the Court said (180 F.2d 83):

"A continuation of the general employment is indicated by the facts that the general employer may at any time substitute another servant, that the time of employment is short, and that the lent servant has the skill of a specialist.

"A continuance of the general employment is also indicated in the operation of a machine where the general employer rents the machine and a servant to operate it, particularly if the instrumentality is of considerable value. Normally, the general employer expects the employee to protect his interests in the use of the instrumentality and these may be divergent from the interests of the temporary employer. If the servant is expected only to give results called for by the temporary employer and to use the instrumentality as the servant would expect his general employer would desire, the original service continues."

The foregoing quotation, which also appears in the Restatement of the Law, Agency, § 227, p. 501, is peculiarly appropriate to the present case. Undeniably Lamberts Point Dock was at liberty to substitute another crane operator at any time; the time of employment was of brief duration; the services required that of a skilled specialist; the crane was large and valuable, so much

so that the pier operator would permit no one other than its skilled personnel to operate same; the crane operator was expected to give results and the stevedore was not interested in the particular manner in which the crane was physically moved or operated.

We do not believe that the Virginia authorities are in conflict with these principles. Each case is dependent upon the particular set of facts. We find nothing in Coker v. Gunter, 191 Va. 747, 63 S.E.2d 15, and Beasley v. Whitehurst, 152 Va. 305, 147 S.E. 194, which would lead to a contrary pronouncement.

Cases are legion on this subject. To review them in detail would serve no useful purpose. It is sufficient to state that, under the facts here presented, the crane operator continued in the general employment of Lamberts Point Docks, Incorporated, and, as libellant has instituted a direct action against this respondent for the wrongful death of Mazzacane, a decree will be entered in favor of the libellant, Ware, as administrator of the estate, in the sum of $25,000 which, after the payment of reasonable attorney's fees and non-recoverable costs, shall be divided equally between Enrico Mazzacane and Rosa Mazzacane, father and mother of the deceased, to the exclusion of the decedent's brothers and sisters. As to libellant's claim against Cia de Navegacion Andes, S. A., Southern Stevedoring Corporation, and the SS Asteropes, the decree will be in favor of said respondents.

We turn to the cross-libel filed by the owners of the vessel against Lamberts Point Docks and Southern Stevedoring. The damage to the vessel and cost of survey aggregated $397, which cross-libellant is clearly entitled to recover. Under its contract with the shipowner, Southern Stevedoring impliedly warranted that the work would be performed in a reasonably safe and workmanlike manner. A finding of negligence is not determinative of the shipowner's right to be indemnified for his loss. Irrespective of the fact that Lamberts Point Docks had no direct con-

tractual arrangements with the shipowner, in permitting the crane to be used and furnishing the operator for same, Lamberts Point Docks likewise impliedly warranted to Southern Stevedoring that it would perform its services in a reasonably safe and workmanlike manner and thereby provide a crane operator who was free from negligence. The shipowner was a third-party beneficiary of Southern Stevedoring's contract with the Lamberts Point Docks and, therefore, Lamberts Point Docks is liable to the cross-libellant. American Export Lines, Inc. v. Revel, 4 Cir., 266 F.2d 82; Crumady v. The Joachim Hendrik Fisser, 358 U.S. 423, 79 S.Ct. 445, 3 L.Ed. 2d 413; Calmar Steamship Corp. v. Nacirema Operating Co., 4 Cir., 266 F.2d 79, certiorari denied 361 U.S. 816, 80 S.Ct. 56, 4 L.Ed.2d 62. Lamberts Point Docks would likewise be liable in tort for these damages. Interest will be allowed on the aforesaid $397 at the rate of six percent per annum from July 3, 1957.

█ The Court is without the benefit of argument as to the possible liability of Southern Stevedoring to the shipowner under its implied warranty. That the warranty exists is not to be doubted. Undeniably, however, Southern Stevedoring could not be held liable for the negligence of an employee of a thoroughly reputable and competent independent contractor. Whether, by reason of the implied warranty, Southern Stevedoring may be held liable in contract is a question left open for further consideration, if the shipowner, the only party in interest, is desirous of a further hearing. Lamberts Point Docks could not complain as, assuming arguendo the contractual liability of Southern Stevedoring, it would be within the equitable powers of the court to permit an impleading petition to be hereafter filed by Southern Stevedoring against Lamberts Point Docks as to the matters alleged in the cross-libel and, in the final analysis, Lamberts Point Docks would be the party charged with the damages allowed under said cross-libel.

█ The shipowner requests indemnity over for the decedent's burial expenses, including the cost of shipping the body to Italy, the total expense aggregating $2117.43. Under the Shipowners' Liability Convention of 1936, Art. 7, § 1, 54 Stat. 1693, 1699, it is provided that the shipowner is liable for burial expenses in the case of a seaman's death, if, at the time of death, the deceased was entitled to medical care and maintenance at the shipowner's expense. Norris, The Law of Seamen, Vol. 2, § 605. But it is equally true that when the seaman dies at a foreign port, as in this case, he is only entitled to be buried at the place of his death. If the family wishes the body shipped to his home country, the cost or obligation to transport the corpse is not the responsibility of the shipowner. 2 Norris Supp. (1958) Law of Seamen, § 605. Accordingly, the right of recovery is limited to the expenses incurred in Norfolk, where the death occurred, and is fixed at $600, plus interest at the rate of six percent per annum from September 11, 1957, for which amount Lamberts Point Docks is liable for the same reasons as assigned with respect to the claim for damages.

█ We are told that, in an action for wrongful death under the Virginia statute, there can be no recovery for funeral expenses under Conrad v. Thompson, 195 Va. 714, 721, 80 S.E.2d 561. We agree, as the statute provides for a recovery for the benefit of decedent's near relatives, and not for his estate. However, the cross-libellant does not seek recovery under any theory of wrongful death. The shipowner merely alleges that Lamberts Point Docks and Southern Stevedoring had an implied contract to perform the work in a reasonably safe and workmanlike manner, and that as a result of the breach of this implied contract the shipowner sustained certain damages, including the funeral expenses. While libellant could not recover such expenses from either Lamberts Point Docks or Southern Stevedoring as no employer-employee relationship existed between the deceased

**946**

seaman and these respondents [1], it does not necessarily follow that one who has been damaged by the breach of an implied warranty may not recover under the contractual theory of indemnity. Cf. Jones v. Waterman S. S. Corporation, 3 Cir., 155 F.2d 992, 1000.

A decree will be entered in conformity with the views expressed herein, which are adopted by the Court in lieu of specific findings of facts and conclusions of law, pursuant to General Admiralty Rule 46½, 28 U.S.C.A.

---

1. Turner v. Wilson Line of Massachusetts, Inc., 1 Cir., 242 F.2d 414, 417.