Patrick RODERICK, Jr., Plaintiff,

v.

Iver BUGGE, Defendant/Third
Party Plaintiff,

v.

B.T. EQUIPMENT COMPANY, et al.,
Third Party Defendants.

Civ. A. No. 74–1969–N.

United States District Court,
D. Massachusetts.

March 30, 1984.

Nathan Greenberg, Boston, Mass., for plaintiff.

Tom Muzyka, Leo F. Glynn, Glynn & Dempsey, Boston, Mass., for defendant/third party plaintiff.

James C. Gahan, Jr., Boston, Mass., for B.T. Equipment Co.

## MEMORANDUM AND ORDER

DAVID S. NELSON, District Judge.

Patrick Roderick, a longshoreman employed by the stevedoring company J.J. Orr & Sons, Inc. (Orr), was injured when a steel I-beam, which had been hoisted by crane from a ship and lowered onto wooden bolsters on shore, toppled onto his foot as he attempted to release the crane's hook. Roderick brought suit under section 5(b) of the Longshoremen's and Harbor Workers' Compensation Act (LHWCA), 33 U.S.C. § 905(b), against the corporate shipowner

Iver Bugge (Bugge). The shipowner in turn cross-claimed against B.T. Equipment Co. (BT), an equipment rental company which had leased to Orr a crane with an operator to help unload the ship. The primary action between Roderick and Bugge was settled for $40,000 prior to trial. What remain at issue are Bugge's alternative claims against BT for indemnity and contribution. In support of the indemnity claim Bugge argues that, notwithstanding its own arguably negligent conduct, BT's breach of its implied warranty of workmanlike performance entitles the shipowner to full reimbursement for the $40,000 settlement plus all costs incurred in the primary action. Alternatively, it contends that BT's negligence "substantially exceeded" any of its own and that BT should therefore shoulder the lion's share of the damages. In a four-part response, BT argues that it is immune from liability since the crane operator was a "borrowed servant" of the stevedore Orr; that indemnity is foreclosed by the 1972 amendments to the LHWCA; that the crane operator was free of negligence; and that in any event the crane involved in the mishap was never identified as that belonging to BT. On the basis of the evidence adduced at a two-day trial, the court concludes that neither indemnity nor contribution is warranted.

### Preliminary Findings of Fact

On the morning of April 27, 1974, the freighter M/V Saga Sword was berthed at the Municipal Pier in Providence, Rhode Island, loaded with a cargo of steel products. Bugge had earlier retained Orr, the stevedore, to conduct the unloading. While Orr owned several cranes which it planned to use on this job, it had determined that an additional crane would be necessary. Accordingly, Orr had leased a crane with operator from BT, a company in the business of leasing cranes and other heavy equipment. This crane was delivered and erected by BT personnel on April 24 and was used in discharging the Saga Sword on April 27. David Shannon, a Rhode Island licensed crane engineer and a BT employee, was at the controls.

Each of the several cranes involved in the unloading process serviced a different hatch, lifting bundles of steel from the ship's hold and lowering them onto wooden bolsters on the pier from which they were then removed by forklift. Inside each hatch, a crew of four longshoremen moved the successive steel bundles into position and connected them to the crane's hook by means of attached wire slings. The crews worked under the direction of an Orr supervisor, who in turn reported to the ship officer employed by Bugge. In maneuvering a crane inside a hatch—an area beyond his field of vision—each operator was guided by standard hand signals made by an Orr "signal man" perched on deck. Once a load was free of the hatch, the operator swung it over to the pier and lowered it to a designated spot within his field of vision, again with the guidance of hand signals received from one of two "landers" on the deck. The landers, also Orr employees, then disconnected the slings from the crane's hook.

Plaintiff Roderick, together with Lewis Paiva, comprised one such team of landers during the unloading of the Saga Sword, with Paiva also serving as the dockside signal man. The morning hours were devoted to discharging steel rolls. Following lunch break, during which their crane was moved to another hatch, they commenced unloading steel I-beams which measured some twenty feet long, twelve inches wide and eight inches high. The I-beams were taken out individually during the first half-hour, without incident. Then Bugge's ship officer, in an attempt to complete the job by five o'clock, directed the Orr employees to unload two I-beams at a time. On the very first such load, the two I-beams, each of which was connected to the crane's hook by a pair of slings, became crisscrossed, with one resting at least in part on top of the other. Despite this configuration, Paiva gave the signal to lower the load onto the pallets and release the tension on the slings. As Roderick reached over to disconnect the hook, the upper I-beam top-

pled off and pinned his foot to the ground, causing his injuries.[1]

### The Borrowed Servant Defense

Since the early stages of this suit, BT has contended that its crane operator Shannon constituted a borrowed servant of Orr for the duration of the Saga Sword job, thereby rendering Orr rather than BT responsible under respondeat superior for any negligence or breach of warranty on Shannon's part. In the face of potent arguments on each side, the court rejects BT's position. The two traditional tests governing this "extraordinarily troublesome" area, *Wilson v. Nooter Corp.,* 475 F.2d 497, 500 (1st Cir.), *cert. denied,* 414 U.S. 865, 94 S.Ct. 116, 38 L.Ed.2d 85 (1973) —"whose is the work and whose is the power of control," *Standard Oil Co. v. Anderson,* 212 U.S. 215, 225, 29 S.Ct. 252, 255, 53 L.Ed. 480 (1909)—yield inconclusive answers. Certainly in one sense Shannon was advancing the work of Orr by participating in the unloading of the Saga Sword; the use of cranes, which Orr often supplied itself, constituted an integral part of a job that had been specifically assigned to the stevedore and was within its normal province. At the same time, Shannon "was furthering his own employer's sole business, which consists of renting, for profit, cranes and operators to construction contractors" and others. *Ciejek v. Crane Ser-*

*vice Co.,* 351 F.2d 788, 791 (D.C.Cir.1965); *see also Poole v. Clagett,* 196 F.2d 775 (D.C.Cir.1952) (crane and operator leased for profit "in regular course of appellee's business"); *Haw v. Liberty Mutual Ins. Co.,* 180 F.2d 18 (D.C.Cir.1950) (same as to lease of bulldozer with operator).

The issue of control similarly pulls in both directions.[2] On the one hand, BT continued to pay Shannon's wages and withhold his taxes, and it retained the right both to fire him and to replace him on the job with another operator. The crane was of considerable value and complexity, raising the inference that BT expected Shannon to protect its interests whenever they conflicted with Orr's. In addition, the lease term was extremely brief, the operation of the crane required the skill of a specialist, and the renting of cranes with operators, as noted above, constituted BT's sole business. These several factors each suggest that ultimate control over the crane's operations remained with BT. *See, e.g., Wilson v. Nooter Corp.,* 475 F.2d at 501; Restatement (Second) of Agency § 227, Comment c. Other factors militate against this conclusion. Since the rental fee for the crane included an hourly operator charge, Orr at least indirectly paid Shannon's wages. *See, e.g., Huff v. Marine Tank Testing Corp.,* 631 F.2d 1140, 1143 (4th Cir.1980). On the job site, Orr directly controlled what work Shannon was

---

**1.** This account is based solely on Roderick's testimony and was flatly contradicted by the only other description of the events preceding the injury, that offered by Paiva. (The other potential witness to the incident—David Shannon, the BT crane operator—had no recollection of the accident.) Paiva indicated that the two beams remained properly aligned while airborne and landed side-by-side and flat on the pallets. The court has credited Roderick's version for three reasons. First, Paiva stated he did not observe "what was going on with the beams at Mr. Roderick's end" some twenty feet away, suggesting the absence of close surveillance. Second, Roderick's account is less self-serving than is Paiva's. The former leaves Roderick open to the charge of contributory negligence by his reaching in when the beams were unaligned; the latter clears Paiva of any misconduct which would be attributable to him, in his status as signal man, under Roderick's de-

scription. Finally, the undisputed fact that a beam did fall onto Roderick's foot would be explicable under Paiva's account only by speculating that it slid off the ends of the wooden bolsters—a theory lacking any evidentiary support whatsoever.

**2.** Although the *Anderson* Court, *see* 212 U.S. at 221–22, 29 S.Ct. at 254, spoke of the question of control as "useful only in ascertaining whose work is being performed," *Raymond v. I/S Caribia,* 626 F.2d 203, 207 (1st Cir.1980) (Aldrich, J., *concurring*), *cert. denied,* 451 U.S. 969, 101 S.Ct. 2045, 68 L.Ed.2d 348 (1981), the control factor has been considered "the *sine qua non* of the borrowed servant rule," *id.* at 207 n. *, and "the prime requisite for invoking" that doctrine. *Id.* at 205 (majority opinion). *See also Wilson v. Nooter Corp.,* 475 F.2d at 500 (right of control is "fundamental test" for applying borrowed servant doctrine under New Hampshire law).

to perform and when and for the most part how to perform it. The stevedore dictated Shannon's hours of work, specified which hatch to work on, determined the order and size of the loads to be removed, and by the use of hand signals largely guided the actual operation of the crane. Finally, and most importantly in BT's view, the lease agreement contained an indemnification provision which stated in part: "Lessee [Orr] agrees that the equipment and all persons operating such equipment, including Lessor's [BT's] employees, are under Lessee's exclusive jurisdiction, supervision and control...." [3]

After weighing these competing sets of factors, the court concludes for several reasons that Shannon never became a borrowed servant of Orr. First, the inference of control stemming from Shannon's receipt of hand signals from Orr employees is largely undermined by the *Anderson* Court's characterization of a similar arrangement there. It stated that the "giving of the signals [to the winchman] under the circumstances of this case was not the giving of orders, but of information, and the obedience to those signals showed cooperation rather than subordination...." 212 U.S. at 226, 29 S.Ct. at 256; accord, e.g., *Lopez v. Oldendorf,* 545 F.2d 836, 839 (2d Cir.1976), *cert. denied,* 431 U.S. 938, 97 S.Ct. 2650, 53 L.Ed.2d 256 (1977); *Wilson v. Nooter Corp.,* 475 F.2d at 501 n. 1. The Court's description proves equally applicable to the circumstances here, since Shannon testified that, while he regularly obeyed the hand signals, he remained free to operate the crane in accordance with his own judgment when necessary. Moreover, while maneuvering on the dock, as opposed to inside the hold, Shannon was able to supplement the hand-signal information with his own visual observations.

Second, the indemnification provision proves of marginal relevance to the borrowed servant issue notwithstanding its direct assignment of "exclusive ... control" over the crane and operator to Orr.[4] As with any factual matter, the actual circumstances of the arrangement are controlling rather than the parties' advance characterization of those circumstances. In addition, other portions of the indemnification provision belie any intention on the part of the parties to establish a borrowed servant relationship.[5] Orr is relieved of its duty to indemnify BT whenever the crane operator is "sole[ly] negligen[t]." Yet were Shannon to be deemed a borrowed servant, the percentage of the proven negligence that is attributable to him should have no bearing on Orr's liability for his misconduct. More generally, there would be no need in the first place for an explicit indemnification agreement were a borrowed servant relationship to exist, since BT by definition would bear no legal responsibility for Shannon's conduct.

Finally, it is noteworthy that the vast majority of courts evaluating the status of

---

3. Bugge contends that the provisions of the lease agreement are not binding because Orr never affixed its signature to the contract. The court need not resolve this issue in light of the disposition reached below.

4. This provision reads in its entirety:
   INDEMNIFICATION: Lessee agrees that the equipment and all persons operating such equipment, including Lessor's employees, are under Lessee's exclusive jurisdiction, supervision and control and agrees to indemnify and save Lessor, its employees and agents harmless from all claims for death or injury to persons, including Lessor's employees, and from all loss, damage or injury to property, including the equipment, arising in any manner out of Lessee's operation. Lessee's duty to indemnify hereunder shall include all costs or expenses arising out of all claims specified herein, including all court and/or arbitration costs, filing fees, attorneys fees and costs of settlement. Lessee shall not be required to indemnify Lessor for its sole negligence, but, Lessor's liability for damage caused by the sole negligence of Lessor, its agents and employees, hereunder shall be limited to the amount of Lessor's liability insurance.

5. As one of nine factors to be examined in addressing the borrowed servant issue, the Fifth Circuit inquires whether there was any "agreement, understanding, or meeting of the minds between the original and the borrowing employer." *Gaudet v. Exxon Corp.,* 562 F.2d 351, 355 (5th Cir.1977), *cert. denied,* 436 U.S. 913, 98 S.Ct. 2253, 56 L.Ed.2d 414 (1978).

crane operators in analogous circumstances either have ruled that no borrowed servant relationship existed, *see, e.g., Standard Oil Co. v. Anderson,* 212 U.S. at 215, 29 S.Ct. at 252; *Lopez v. Oldendorf,* 545 F.2d at 839; *Ware v. Cia De Navegacion Andes, S.A.,* 180 F.Supp. 939, 942–44 (E.D.Va. 1960); *cf. Williams v. Pennsylvania R.R. Co.,* 313 F.2d 203, 208–09 (2d Cir.1963) (joint servant); *Haw v. Liberty Mutual Ins. Co.,* 180 F.2d at 22 (bulldozer operator), or have reversed directed verdicts that were premised on a finding that such a relationship necessarily existed. *See, e.g., Wilson v. Nooter Corp.,* 475 F.2d at 502; *Ciejek v. Crane Service Co.,* 351 F.2d at 792; *Poole v. Clagett,* 196 F.2d at 776. *Compare, e.g., Western Marine & Salvage Co. v. Ball,* 37 F.2d 1004 (D.C.Cir.1930). *See also* Restatement (Second) of Agency § 227, Comment c ("A continuance of the general employment is also indicated in the operation of a machine where the general employer rents the machine and a servant to operate it, particularly if the instrumentality is of considerable value."). For these reasons, the court concludes that BT is properly subject to liability for any misconduct attributable to its employee Shannon.

### Indemnity

In its effort to gain full reimbursement from BT, Bugge appropriately has made no attempt to invoke a tort-based theory of indemnity. Such a theory is designed

> to shift the whole loss upon the more guilty of the two tortfeasors ... only where the party seeking it was merely passively negligent while the would-be indemnitor was actively at fault.... Where the party seeking indemnification was itself guilty of acts or omissions proximately causing the plaintiff's injury, tort indemnification is inappropriate.

*Araujo v. Woods Hole, Martha's Vineyard, Nantucket S.S. Auth.,* 693 F.2d 1, 3 (1st Cir.1982). As discussed below, Bugge's decision to commence unloading pairs of I-beams simultaneously constituted more than merely "passive" negligence.

Bugge relies instead·on an implied contractual right to indemnity said to arise from BT's breach of an implied warranty of workmanlike performance. This doctrine, first promulgated in *Ryan Stevedoring Co. v. Pan-Atlantic S.S. Corp.,* 350 U.S. 124, 76 S.Ct. 232, 100 L.Ed. 133 (1956), originated in the context of triparty personal-injury litigation involving longshoremen, shipowners and stevedores and arose in response to two earlier Court decisions. In *Seas Shipping Co. v. Sieracki,* 328 U.S. 85, 66 S.Ct. 872, 90 L.Ed. 1099 (1946), the Court concluded that longshoremen are "seamen" to whom shipowners owe a duty of seaworthiness—a decision that subjected shipowners to a form of liability without fault. Six years later, the Court ruled that shipowners are not entitled to contribution from stevedores as joint tortfeasors. *Halcyon Lines v. Haenn Ship Ceiling & Refitting Corp.,* 342 U.S. 282, 72 S.Ct. 277, 96 L.Ed. 318 (1952).[6] Together, these decisions placed a shipowner in the "unenviable position" of being liable to an injured longshoreman even when his injuries resulted from "an unseaworthy condition caused wholly by the stevedore's negligence." *Fairmont Ship. Corp. v. Chevron Int'l Oil Co.,* 511 F.2d 1252, 1255 (2d Cir.), *cert. denied,* 423 U.S. 838, 96 S.Ct. 66, 46 L.Ed.2d 57 (1975), *quoted in Maritime Overseas Corp. v. Northeast Petroleum Indus., Inc.,* 706 F.2d 349, 353 n. 5 (1st Cir.1983). To correct this perceived inequity, the *Ryan* Court read into the stevedore's contract an implicit, two-part undertaking: first, an agreement to perform its services in a workmanlike manner—a warranty "comparable to a manufacturer's warranty of the soundness of its manufactured product"—and, second, a promise to indemnify the shipowner for all damages

---

**6.** Although the *Halcyon* Court purported to rest this ruling on the common law rule against contribution rather than the exclusive liability provision of the LHWCA, later decisions appear to rest the *Halcyon* non-contribution rule on the statutory provision. *E.g., Cooper Stevedoring Co. v. Fritz Kopke, Inc.,* 417 U.S. 106, 94 S.Ct. 2174, 40 L.Ed.2d 694 (1974); *see Zapico v. Bucyrus-Erie Co.,* 579 F.2d 714. 719 (2d Cir.1978).

stemming from a breach of such warranty. 350 U.S. at 134, 76 S.Ct. at 237. At the root of this decision was a desire to impose liability upon the party best situated to prevent accidents. *E.g., Italia Societa per Azioni di Navigazione v. Oregon Stevedoring Co.*, 376 U.S. 315, 323–24, 84 S.Ct. 748, 753–754, 11 L.Ed.2d 732 (1964); *Maritime Overseas Corp. v. Northeast Petroleum Indus., Inc.*, 706 F.2d at 353. In light of its supervision and control of the unloading process, the stevedore was thought generally to occupy that position. Therefore, given the shipowner's strict liability stemming from its duty of seaworthiness, the combined warranty/indemnity doctrine was deemed necessary to effect the desired reassignment of ultimate liability to the stevedore.

Courts have since extended the *Ryan* doctrine beyond the stevedoring context to embrace situations analogous to that involved here. Even though the warranty is contractual in origin, its existence has not been dependent on privity of contract between shipowner and contractor. *E.g., Waterman S.S. Co. v. Dugan & McNamara, Inc.*, 364 U.S. 421, 424–25, 81 S.Ct. 200, 202, 5 L.Ed.2d 169 (1960). Consequently, subcontractors who, although lacking any direct relationship with the shipowner, have performed, and exercised some degree of control over, work ultimately accruing to the shipowner's benefit have been held accountable under *Ryan*. *See, e.g., Todd Shipyards Corp. v. Turbine Service, Inc.*, 674 F.2d 401, 417 (5th Cir.), *cert. denied*, 459 U.S. 1036, 103 S.Ct. 448, 74 L.Ed.2d 603 (1982); *United States v. San Francisco Elev. Co.*, 512 F.2d 23, 26–27 (9th Cir.1975); *Ware v. Cia De Navegacion Andes, S.A.*, 180 F.Supp. at 945. So long as the subcontractor in performing its work possesses some degree of "expertise, control, supervision and ability to prevent accidents," *Fairmont Ship. Corp. v. Chevron Int'l Oil Co.*, 511 F.2d at 1257, *quoted in Maritime Overseas Corp. v. Northeast Petroleum Indus., Inc.*, 706 F.2d at 353–54, and so long as its relationship with the shipowner, although lacking any direct contractual link, is one that "in the context of

shipping ... makes the implication reasonable," *Flunker v. United States*, 528 F.2d 239, 243 (9th Cir.1975), a covenant of workmanlike performance has been implied.

Congressional amendments to the LHWCA in 1972 substantially revamped this liability scheme. Concluding that the triangular litigation among longshoreman, shipowner and stevedore was too costly and ultimately disruptive of the compensation scheme, *see* H.Rep. No. 1441, 92d Cong., 2d Sess., *reprinted in* 1972 U.S. Code Cong. & Admin.News 4698, 4702–03, Congress restructured the relationship among these parties in two significant respects. First, it abolished the shipowner's liability to the longshoreman for unseaworthiness—the doctrine established by *Sieracki* that essentially subjected the owner to absolute liability—and instead predicated the vessel's liability on negligence. Second, it eliminated the shipowner's action for *Ryan* indemnity against the stevedore: "the employer shall not be liable to the vessel for such damages [caused by the vessel's negligence] directly or indirectly and any agreements or warranties to the contrary shall be void." 33 U.S.C. § 905(b), *added by* Pub.L. No. 92–576, § 18(a), 86 Stat. 1263 (1972). By thus overruling *Sieracki* and *Ryan* "insofar as they made an employer circuitously liable for injuries to its employee," *Cooper Stevedoring Co. v. Kopke, Inc.*, 417 U.S. 106, 113 n. 6, 94 S.Ct. 2174, 2178 n. 6, 40 L.Ed.2d 694 (1974), Congress intended to provide that, "as between an employer and its injured employee, the right to compensation under the Act should be the employee's exclusive remedy." *Id.* at 113, 94 S.Ct. at 2178 (footnote omitted).

In the present case, of course, the shipowner (Bugge), having settled the longshoreman's (Roderick's) negligence action against it, seeks indemnity—not from the stevedore/employer (Orr)—but from the crane rental company (BT) which Orr had retained to help unload the freighter. Bugge maintains that the 1972 amendments are for this reason irrelevant: they explicitly abolished only indemnity actions

by vessels against employers, leaving all such actions against non-employers fully intact. BT counters that, by eliminating the vessel's absolute liability under the seaworthiness doctrine, the amendments have removed the principal rationale for—and thus should be construed as abolishing—*Ryan* indemnity actions against employers and non-employers alike.

There is much to be said for BT's position. The notion that "the shipowner's strict liability for unseaworthiness ... rests at the heart of *Ryan* indemnity," *Fairmont Ship. Corp. v. Chevron Int'l Oil Co.*, 511 F.2d at 1257, has gained widespread judicial recognition. And on this premise, many courts have departed from the traditional *Ryan* analysis in cases where the claimed indemnitee has not been subject to strict liability.[7] Some have distinguished between the warranty of workmanlike performance and the obligation to indemnify for breach thereof, continuing to recognize the former but not the latter. *E.g., Agrico Chem. Co. v. M/V Ben W. Martin*, 664 F.2d 85, 93–94 (5th Cir.1981); *Navieros Oceanikos, S.A. v. S.T. Mobil Trader*, 554 F.2d 43, 46–47 (2d Cir.1977); *Fairmont Ship Corp. v. Chevron Int'l Oil Co.*, 511 F.2d at 1257–60; *accord,* Alvey, *The Implied Warranty of Workmanlike Performance in Towage: A Viable Theory,* 7 Mar.Law. 1, 16–17 (1982). Others, along the lines suggested by BT here, have refused to extend either the warranty or the indemnity beyond non-fault situations, *e.g., Stranahan v. A/S Atlantica & Tinfos Papirfabrik*, 521 F.2d 700, 703 (9th Cir. 1975) (per curiam); *Davis v. Chas. Kurz & Co.*, 483 F.2d 184, 187 (9th Cir.1973), often

resorting instead to comparative negligence principles in such circumstances. *E.g., McGuire v. Lykes Bros. S.S. Co.*, 486 F.Supp. 1374, 1381 (E.D.Wis.1980); *accord, e.g.,* Stover & Plaetzer, *Comparative Negligence and the Harbor Workers' Act: History, Examination, Diagnosis and Treatment,* 63 Marq.L.Rev. 349, 389–94 (1980). Were indemnity to be deemed unavailable here in accordance with this approach, such an allocation of damages based on comparative fault would be permissible since the employer Orr is not a party. *See, e.g., Edmonds v. Compagnie Generale Transatlantique*, 443 U.S. 256, 271 n. 30, 99 S.Ct. 2753, 2762 n. 30, 61 L.Ed.2d 521 (1979); *cf. United States v. Reliable Transfer Co.*, 421 U.S. 397, 95 S.Ct. 1708, 44 L.Ed.2d 251 (1975) (maritime collision case).

A parallel line of cases, however, rejects any such limitation on the *Ryan* doctrine. In *Henry v. A/S Ocean*, 512 F.2d 401 (2d Cir.1975), for example, the court upheld an award of indemnity against a stevedore in a pre-amendments case, notwithstanding that the shipowner's liability was based on negligence rather than unseaworthiness. Emphasizing the secondary rationale for the *Ryan* doctrine—the desire "to allocate risks among those ... best able to minimize the particular risk involved,"[8] *id.* at 406—the court concluded: "The stevedore's liability for breach of warranty does not rest upon the nature of the shipowner's liability (i.e., whether it is based upon unseaworthiness rather than upon negligence) but upon the stevedore's own contractual obligation to the shipowner." *Id; accord,*

---

**7.** Although the legislative history of the 1972 amendments contains no discussion of the continued availability of *Ryan* indemnity against non-employers, it does underscore the link between non-fault liability and such indemnity:

> Since the vessel's liability is to be based on its own negligence, and the vessel will no longer be liable under the seaworthiness doctrine for injuries which are really the fault of the stevedore, there is no longer any necessity for permitting the vessel to recover the damages for which it is liable to the injured worker from the stevedore or other employer of the worker.

H.Rep. No. 1441, 92d Cong., 2d Sess., *reprinted in* 1972 U.S.Code, Cong. & Admin.News 4698, 4704.

**8.** The First Circuit in *Maritime* recognized the dual bases for the *Ryan* doctrine: "The rationale for this implied indemnity arises from the shipowner's nondelegable duty to provide a seaworthy vessel coupled with the fact that a stevedoring company which takes control of the ship to unload it is, during the course of that operation, more capable than the shipowner of avoiding accidents." 706 F.2d at 35?.

*e.g.,* 2A A. Larson, Workmen's Compensation Law § 76.62(f), at 14–678 (1982) (under pre-1972 law, "it is also a mistake to confine *Ryan* ... to cases in which the indemnitee has been held liable without fault"). Of course, the fact that indemnity was available prior to 1972 in all cases in which absolute liability was *potentially* available against the indemnitee, even if not proven in the specific case—as those authorities suggest—does not mean that indemnity should remain available now that the amendments have eliminated absolute liability as a potential remedy.

Yet Bugge's position does find indirect support in a group of post-amendments cases. These address the converse situation from that presented here: an indemnity suit by a non-vessel against the stevedore/employer. In *Zapico v. Bucyrus-Erie Co.,* 579 F.2d 714 (2d Cir.1978), a crane manufacturer sought indemnity from a stevedore following a finding that their respective acts of negligence contributed equally to a longshoreman's injuries. Although the court ultimately rejected this claim due to the absence of any such implicit contractual undertaking, it indicated that indemnity suits by non-vessels against employers were permissible under the amended Act notwithstanding the unavailability of absolute liability against the former. After noting that "the statute explicitly cuts off indemnity only to a 'vessel,'" the court reasoned: "The shipowners got a *quid pro quo* for the loss of their indemnity rights.... The 1972 amendments eliminated the unseaworthiness theory and limited vessel liability to negligence in exchange for the surrender of the vessel's indemnity rights.... No such *quid pro quo* was offered to non-vessels." *Id.* at 721 (footnote omitted). Subsequent cases have followed this approach. *See, e.g., Pippen v. Shell Oil Co.,* 661 F.2d 378, 387–88 (5th Cir.1981) (dictum); *Marr Equip. Corp. v. I.T.O. Corp.,* 14 Mass.App. 231, 233–35, 437 N.E.2d 1076 (1982).

As applied to the present context, however, these decisions cut in both directions. On the one hand, their analysis buttresses Bugge's contention that the elimination of strict liability on the part of shipowners does not by itself preclude claims against non-owners for *Ryan* indemnity. On the other, the *Zapico* court's emphasis on the *quid pro quo* received by the shipowners certainly militates against continued recognition of a right of indemnity on their part against anybody. Moreover, whereas the employer's involvement in the *Zapico* case prevented any apportionment of damages according to comparative fault, no such bar exists in vessels' suits against non-employers, as mentioned above.

In any event, this conflict need not be resolved in the present case. Even if indemnity claims by vessels against non-employers are not foreclosed by the amended statute, the court concludes for two reasons that Bugge has failed to establish a right to such indemnity here. First, the evidence establishes that the extent of BT's supervision and control over the unloading process was insufficient to justify recognition of an implied warranty of workmanlike service in the circumstances. As discussed above, underlying the *Ryan* decision was a desire to impose liability "upon the party best situated to adopt preventive measures and thereby to reduce the likelihood of injury." *Italia Societa per Azioni di Navigazione v. Oregon Stevedoring Co.,* 376 U.S. at 324, 84 S.Ct. at 754. The court finds that BT was not that "best situated" party. It is true, as Bugge asserts, that subcontractors in BT's position, along with other parties lacking privity with the claimed indemnitee, have frequently been found subject to the *Ryan* warranty. But in each of the cases cited by Bugge and in others, the subcontractor exercised a degree of supervision and control far more extensive than that undertaken by BT here. *See, e.g., Waterman S.S. Corp. v. Dugan & McNamara, Inc.,* 364 U.S. 421, 81 S.Ct. 200, 5 L.Ed.2d 169 (1960); *United States v. San Francisco Elev. Co.,* 512 F.2d at 25; *Hartnett v. Reiss S.S. Co.,* 421 F.2d 1011, 1014, 1016 (2d Cir.), *cert. denied,* 400 U.S. 852, 91 S.Ct. 49, 27 L.Ed.2d 90 (1970) (indemnitor "supervised the unloading operation" and "was necessarily in partial control of the ship"); *United New York Sandy Hook Pilots Assoc. v. Rodermond*

**634**

*Indus., Inc.,* 394 F.2d 65, 73 (3d Cir.1968) (subcontractor "had control over the method and manner in which the work was done"). Here, by contrast, BT had minimal control over the unloading process. As discussed above, Shannon, although free to follow his own judgment where appropriate, was guided in his operation of the crane by hand signals from Orr employees. The time, place, and manner of work were under Orr's general direction. And the overall operation was supervised by Bugge's ship officer. Given BT's relatively insignificant place in this chain of command, the court "cannot say that the nature of the unloading operation shows that the parties intended that [BT] should bear ultimate responsibility for the safety of those conducting the unloading operation or that [BT] was in a better position than [Orr or Bugge] to prevent accidents during that operation." *Maritime Overseas Corp. v. Northeast Petrol. Indus., Inc.,* 706 F.2d at 354–55. *Compare, e.g., Ware v. Cia De Navegacion Andes, S.A.,* 180 F.Supp. at 943, 945 (crane operator, with whom "method and manner of moving the crane rested solely," held subject to *Ryan* indemnity for accident occurring when crane was moved).

An assessment of the parties' comparative negligence here also militates against an award of indemnity. Were the court to render findings in this regard (a task obviated by the discussion below as to the crane's identification), it would attribute the principal fault to Bugge and Orr. Bugge's directive to commence removing two I-beams simultaneously, issued in an attempt to complete the job by day's end, was decidedly ill-advised. The Orr lander's signal to Shannon to lower, and then release tension on, the beams despite their configuration was equally blameworthy. In addition, Roderick would be deemed guilty of contributory negligence as a result of his reaching in to disengage the hook while the beams were precariously perched. In this context, the court would find that the crane operator's failure to disregard Paiva's signal and maintain tension on the wire constituted at most one-tenth of the aggregate negligence. The relative insignificance of such misconduct,

particularly vis-a-vis that of Bugge, constitutes an additional reason to deny indemnity here. The Supreme Court has indicated that invocation of the *Ryan* doctrine is dependent on comparative fault, in the sense that intervening vessel negligence of a sufficient magnitude will preclude indemnity recovery. *Weyerhaeuser S.S. Co. v. Nacirema Operating Co.,* 355 U.S. 563, 567, 78 S.Ct. 438, 440, 2 L.Ed.2d 491 (1958); *accord, e.g., Rios v. Empresas Lineas Maritimas. Argentinas,* 575 F.2d 986, 989 (1st Cir.1978); 2A A. Larson, Workmen's Compensation Law, *supra,* at 14–671 to –673, –678. This court concludes that the disparity in relative degrees of fault here is sufficient to call for such a result. *See, e.g., Gator Marine Service Towing, Inc. v. J. Ray McDermott & Co.,* 651 F.2d 1096, 1100 (5th Cir.1981); *Doca v. Marina Mercante Nicaraguense, S.A.,* 634 F.2d 30, 34 (2d Cir.1980), *cert. denied,* 451 U.S. 971, 101 S.Ct. 2049, 68 L.Ed.2d 351 (1981). For each of these reasons, as well as that discussed below, Bugge's claim for indemnity is denied.

### Identity of Crane

Bugge in the alternative advances a claim for contribution based on principles of comparative negligence. It correctly notes that contribution between joint tortfeasors in a maritime action for personal injuries is permissible where, as here, neither tortfeasor's liability is limited by statute. BT responds that Bugge has failed to carry its burden of establishing that the crane involved in the accident belonged to BT. The court concurs in BT's assertion and dismisses the claim for contribution on this basis.

It is undisputed that Orr employed several of its own cranes along with the one leased from BT in unloading the Saga Sword. In its attempt to link BT's crane to the accident, Bugge relies on the testimony of Roderick and Shannon. Roderick's testimony on this issue was so contradictory as to lack any probative value. He stated first that the BT crane was involved in his accident, then that it was an Orr crane, and finally that he couldn't recall who owned it. Similarly, he testified first that the crane

was yellow (Shannon stated that BT's cranes were red) and then that he couldn't remember the color. The court discounts his testimony on this issue entirely.

As to Shannon's testimony, Bugge relies on a single statement: when asked whether he had been working with Paiva, Roderick's partner, on the day of the accident, Shannon replied, "I assume so, yes." Bugge's characterization of this comment as an unequivocal affirmation is belied by Shannon's other testimony. He indicated that he had no recollection of unloading the Saga Sword and no memory of the accident. His description of his activities that day was based exclusively on company records, and he repeatedly prefaced his responses with the comment "according to the records." Moreover, BT's records contained no indication that Shannon worked with Paiva and Roderick. If anything, they support the opposite inference. BT's comptroller stated that it was a customary business practice to prepare a report of any unusual incident occurring in conjunction with the use of its cranes. The records contain no such report with regard to the date of Roderick's injury.

For these reasons, judgment shall enter for third-party defendant B.T. Equipment Company. SO ORDERED.