Philip SHEEHAN, Plaintiff-Appellant,

v.

MOORE–McCORMACK LINES, INC., Defendant-Appellee,

v.

JOHN W. McGRATH CORPORATION, Third-Party Defendant-Appellant.

Nos. 487, 488, Dockets 35140, 35248.

United States Court of Appeals, Second Circuit.

Argued March 1, 1971.

Decided March 22, 1971.

---

Robert Klonsky, Brooklyn, N. Y. (Di Costanzo, Klonsky & Cutrona, Brooklyn, N. Y., on the brief), for plaintiff-appellant.

James M. Leonard, New York City (Joseph F. McGoldrick, New York City, on the brief), for third-party defendant-appellant.

W. Shelby Coates, Jr., New York City (Browne, Hyde & Dickerson, New York City, on the brief), for defendant-appellee.

Before LUMBARD, Chief Judge, and KAUFMAN and ANDERSON, Circuit Judges.

ANDERSON, Circuit Judge:

On February 20, 1964 plaintiff-appellant, Philip Sheehan, was employed by the John W. McGrath Corporation (McGrath), third-party defendant-appellant, as a member of a longshoreman extra labor force working on the pier at the 23rd Street terminal of defendant, Moore-McCormack Lines, Inc. (Moore-McCormack), owner of the S.S. Mormacteal, which at that time was made fast at the middle berth on the south side of the pier. Moore-McCormack had contracted with McGrath to unload her and to provide extra labor to work as line parties. When Moore-McCormack decided to shift the Mormacteal to the north side of the pier, McGrath, at the shipowner's request, supplied six extra men as line handlers, of which the appellant was one. As it turned out he was one of three assigned to handle the bow lines. Because of a strike of towboat crews, there were no tugs operating in the Port

of New York and it was necessary to warp the vessel around the end of the pier to the opposite side by the use of hawsers and deck winches, and use of the ship's own propulsion.

The handling of the lines was under the supervision of Captain Paul Johansen, Port Captain for Moore-McCormack, who was positioned on the pier opposite the forward end of the ship and directly behind the appellant. A ship's officer was in charge of coordinating deck operations at the ship's bow. The appellant and two fellow longshoremen removed the shore end of the forward bow line from the 30″ high bollard on the pier, which left the working line to hold the bow of the vessel. The forward deck of the ship was 30′ above the pier and the lines ran up, at approximately a 45° angle with the pier, to the bow where they were each attached to deck winches.

As the ship moved astern and its bow fell away from the pier, the deck hands at the bow slacked off the lines on the sheaves of the winches, or hauled in on them, as directed, with a view to controlling the position of the vessel while keeping it made fast to the pier. With one working line remaining fast, the other slackened bow line was removed from the bollard and was passed under the working line by the appellant and his co-workers who walked it down the pier to the next bollard where it was made fast. It then became the holding or working line for the bow while the first working line was slacked off and was in turn carried down the pier to the be passed under the latest working line and thence carried on to the third bollard. The procedure called for the continuance of this inverse leap-frog operation with the lines in pace with the stern-first movement of the ship down to and around the end of the pier.

After the first of these steps was successfully accomplished by the appellant and the other two longshoremen in moving the forward bow line to the second bollard, they went back to the first bollard. The working line was then slacked off and the men slipped it off the bollard, walked it down the pier and began to dip it under the other breast line, now the forward working line. The appellant was positioned at the side of the bollard toward the ship's stern and at the very edge of the pier, and longshoreman Fuimano was on the other side of the bollard. Fuimano was trying to pass the unattached breast line under the working line, which at the time was somewhat slack, to appellant, who was bent over with his head close to and just above the working line as he was trying to reach under it to grasp the line held by Fuimano. At that moment, the operator of the deck winch suddenly took up the slack on the working line without warning. The line snapped up and hit the appellant just behind the right ear. The force of the blow threw him against Captain Johansen, who was standing just behind him, and then onto the stringpiece and apron of the pier. He received a concussion and injury to his neck, right shoulder and left elbow as a result of which he incurred medical expenses of $436.65 and suffered lost wages of $1,762.52.

The district court, D.C., 304 F.Supp. 417, found Moore-McCormack negligent in failing (1) to warn the appellant of the intended action in taking up on the line, (2) to provide a lookout during the operation, (3) to assign sufficient personnel to perform the task safely, and (4) to provide adequate supervision of the project. The court also found the vessel unseaworthy. If found, however, that the appellant was guilty of contributory negligence, and, under the admiralty doctrine of comparative fault, it reduced the award of $10,000 damages by fifty per cent to $5000. It ordered McGrath to indemnify Moore-McCormack for the full amount on the ground that the appellant's negligence established a breach of McGrath's warranty of workmanlike performance. The court found the appellant negligent because "he bent over or straddled a working line, a line which he should have known through his years of experience

* * * was liable to become taut or slacken periodically" and because he "could have been forewarned of the line's tightening by the characteristic of a manila line to sing when it is tightened." We reverse.

■ It is well nigh the universal practice in a warping operation, such as that undertaken on the S.S. Mormacteal, for the bow operations to be under the direction of one of the ship's officers; and that was true here. The deck hands who bent the bow lines on the winches were taking in, holding or slacking off at the direction of the bridge, as necessitated by the drift of the ship during the warping operation. Moore-Mc-Cormack concedes that the taking in on the line which caused appellant's injuries resulted from the operation of the deck winch by the deck hands and not from a sudden movement of the ship as she drifted from the pier. When it became necessary for those at the bow of the ship to take up on the working line, they were chargeable with the knowledge that the longshoremen were in a potentially dangerous position and they had a duty to warn the line party of the intended action. Under these circumstances, the longshoremen had a right reasonably to assume that such a warning would be given and they were under no obligation to anticipate that there would be a failure to fulfill that duty. Moreover, the general supervision of the bow line operation on the pier was conducted by Captain Johansen, who instructed the longshoremen which lines to single-up and which line to move down the pier and he gave the orders as to which line should be slacked off. With Moore-McCormack having this dual control over the operation, there is no basis for finding that the appellant, who was in plain view of Captain Johansen and the ship's officer, could not reasonably expect the working line to remain slackened off unless warned otherwise by Captain Johansen or the ship's officer. The appellant and his fellow longshoremen, therefore, were not guilty of contributory negligence for they performed their task in a customary and workmanlike manner. Although they could have passed the free line under the working line by use of a heaving line, it was much quicker and easier to pass it under by hand, and they did so under the supervision of Captain Johansen.

The evidence does not support the finding that the appellant "straddled" the working line in the ordinary sense of the word because he did no more than bend over it so that his head and neck were close to the working line as he reached under it for the hawser. Nor could he have been warned in time by the "singing" of the working line because it had to be hauled in hard before it vibrated and at best any such vibration and noise would have occurred at the same time the appellant was struck.

■ We are left with a "definite and firm conviction that a mistake has been committed," United States v. United States Gypsum Co., 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948); J. Gerber & Company v. S.S. Sabine Howaldt, 437 F.2d 580 (2 Cir. 1971), and hold that the district court's findings in support of contributory negligence are clearly erroneous. The conclusion of contributory negligence, therefore, which is not entitled to the benefits of the clearly erroneous rule, cannot stand. J. Gerber & Company v. S.S. Sabine Howaldt, *supra*, at 594; Serra, Inc. v. SS Francesco C, 379 F.2d 540, 541 (2 Cir. 1967); Mamiye Bros. v. Barber Steamship Lines, Inc., 360 F.2d 774 (2 Cir.), cert. denied, 385 U.S. 835, 87 S.Ct. 80, 17 L.Ed.2d 70 (1966). Consequently, McGrath is not liable in indemnity and the judgment against the stevedore is reversed and set aside. As it is sufficient to dispose of the case on negligence grounds, we do not need to discuss the issue of unseaworthiness.

■ Reversed and remanded with instructions to enter judgment in favor of the plaintiff for $10,000, which we hold to be fair and adequate damages, and his costs.