Henry T. KRZYWICKI and Anna Krzywicki, Plaintiffs,

v.

TIDEWATER EQUIPMENT COMPANY, INC., Defendant.

PRUDENTIAL LINES, INC., Defendant and Third-Party Plaintiff,

v.

George W. EBERLING, Third-Party Defendant.

Civ. No. H–82–294.

United States District Court, D. Maryland.

Jan. 3, 1985.

Roger L. Smith, Gerald F. Gay and O'Connor, Preston, Glenn and Smith, P.A., Baltimore, Md., for plaintiffs.

Manfred W. Leckszas, Peter J. McNamara and Ober, Kaler, Grimes & Shriver, Baltimore, Md., for defendant and third-party plaintiff Prudential Lines, Inc.

Phillips L. Goldsborough, III, Douglas B. Schoettinger and Smith, Somerville & Case, Baltimore, Md., for defendant Tidewater Equipment Co., Inc. and third-party defendant George W. Eberling.

ALEXANDER HARVEY, II, District Judge.

This admiralty case was tried by the Court sitting without a jury pursuant to Rule 9(h), F.R.Civ.P.[1] Plaintiff Henry T. Krzywicki, a longshoreman, was seriously injured while he was working on a lash barge owned by defendant Prudential Lines, Inc. (hereinafter "Prudential Lines"). In the early afternoon of September 6, 1980, plaintiff was engaged in loading operations on board the Lash Barge PL–1–0325 when a heavy load of cargo was dropped on him by a crane, crushing him to the deck of the barge and causing substantial injuries.

In this civil action, plaintiff, joined by his wife, seeks substantial damages for the personal injuries and other losses he has sustained. On the day that he was injured, plaintiff was a member of a gang of longshoremen supplied to Prudential Lines by Atlantic and Gulf Stevedores, Inc. (hereinafter "Atlantic and Gulf").[2] The defendants here are Prudential Lines and Tidewater Equipment Company, Inc. (hereinafter "Tidewater"), the owner of the crane being used in the loading operations on the

---

1. In their complaint, plaintiffs prayed for a jury trial. In its Memorandum and Order of April 16, 1984, this Court granted defendants' joint motion to strike plaintiffs' jury demand, ruling that the only source of federal jurisdiction in this case was this Court's admiralty jurisdiction and that plaintiffs were therefore not entitled to a jury trial.

2. The complaint was originally filed by plaintiff for the use of Atlantic and Gulf, plaintiff's employer. Atlantic and Gulf was subsequently realigned as a third-party defendant as a result of a third-party complaint filed against it by Tidewater and Eberling. In a Memorandum and Order dated September 6, 1983 and in a later Order dated September 27, 1983, the third-party claims of Tidewater and Eberling against Atlantic and Gulf were dismissed. Thus, Atlantic and Gulf, plaintiff's employer, is no longer a party to this suit.

day in question.[3] Prudential Lines in turn has filed a third-party complaint, naming as third-party defendant George W. Eberling (hereinafter "Eberling"), an employee of Tidewater who was the operator of the crane. Although plaintiffs did not include Eberling as a party defendant in the complaint, they have, after he was joined as a third-party defendant, asserted claims directly against him pursuant to Rule 14(c), F.R.Civ.P. Prudential Lines and Tidewater have each asserted a cross claim against the other, and Eberling has cross claimed against Prudential Lines. Prudential Lines had leased the crane used in the loading operations from Tidewater pursuant to a written agreement. Jocelyn N. Taylor (hereinafter "Taylor"), another longshoreman employed by Atlantic and Gulf, had been serving as the signalman during the loading operations.[4]

Plaintiff[5] alleges that both Prudential Lines and Tidewater were negligent in the operation of the crane and in the loading operations conducted on September 6, 1980. Asserting that Eberling was the employee of defendant Tidewater and the borrowed servant of defendant Prudential Lines, plaintiff contends that either Tidewater or Prudential or both are legally responsible for the serious injuries which he sustained as a result of this accident.[6] In the cross claim that each has filed against the other, Prudential Lines and Tidewater each seek indemnity or contribution from the other defendant. In its third-party complaint, Prudential Lines asserts that if the plaintiff was injured as alleged, it was due to the negligence of Eberling, and Prudential Lines seeks a judgment in its favor against

Eberling if it is held responsible in damages to the plaintiffs.

Pretrial proceedings in this case have been extensive. Following the completion of discovery, a pretrial conference was held and a Pretrial Order, with later amendments, was entered. As disclosed by the Pretrial Order, the essential issues in this case are as follows: (1) whether the accident was proximately caused by the negligence of Eberling; (2) whether plaintiff was contributorily negligent; (3) whether, if negligent, Eberling was the borrowed servant of defendant Prudential Lines at the time of the accident or whether he was then the agent and employee of Tidewater; (4) whether, if Eberling was negligent and the agent and employee of Tidewater at the time of the accident, Tidewater is entitled to be indemnified under the lease agreement; and (5) the amount of any damages to be awarded to the plaintiffs.

The case came on for trial before the Court sitting without a jury. Numerous witnesses testified, and various exhibits were entered in evidence. As to many of the issues of fact, the evidence was conflicting. In resolving these conflicts, due regard has been given to the credibility of the witnesses and the weight their testimony deserves. Findings of fact and conclusions of law, pursuant to Rule 52(a), F.R. Civ.P., are contained herein, whether or not expressly so stated.[7]

## I

### The Facts

Defendant Prudential Lines owns and operates vessels which are engaged in a

---

3. Lash Barge PL–2–0325, named in the original complaint, has been dismissed as a defendant in this case.

4. Taylor was named as a third-party defendant in Prudential Lines' third-party complaint, and cross claims were asserted against him by Tidewater and Eberling. In its Memorandum and Order of September 6, 1983, Taylor's motion for summary judgment as to the third-party claim of Prudential Lines asserted against him was granted, and the cross claims asserted against him by Tidewater and Eberling were likewise dismissed.

5. As used in this Opinion, the term "plaintiff" refers only to Henry T. Krzywicki himself. His wife, Anna Krzywicki, is a plaintiff here only for purposes of the joint claim for loss of consortium which has been asserted.

6. Plaintiff has also asserted that he is the third-party beneficiary of the lease agreement between Prudential Lines and Tidewater. This claim, although of doubtful validity, need not be considered by the Court in view of the Court's rulings on the other issues presented.

7. Following completion of the trial, each of the parties submitted Proposed Findings of Fact.

worldwide system of lash barge operations. A lash barge is a steel, box-like, unmanned structure without any motor or propulsion power of its own. Thus, it is necessary that a lash barge be moved by tug boat to a pier for loading. Once loaded, lash barges are then placed aboard a barge carrier or mother vessel for transportation overseas. The barges being loaded by longshoremen supplied by Atlantic and Gulf on September 6, 1980 were destined for the LASH ATLANTICO, a barge carrier owned by Prudential Lines. The lash barge involved in this case was approximately 60 feet long, 30 feet wide and 13 feet deep and contained approximately 20,000 cubic feet of usable cargo space. Both at the forward and at the aft end of each barge is a rudimentary deck or ledge, some six to seven feet in width.

On September 6, 1980, the Lash Barge PL–1–0325 had been towed to Pier 10, Locust Point Marine Terminal in the Port of Baltimore for loading. Pier 10 was owned by Atlantic and Gulf but had been leased to Prudential Lines. On that date, plaintiff was 60 years of age and had been employed by Atlantic and Gulf for a number of years. A shore-based, mobile crane owned by defendant Tidewater had been furnished to Prudential Lines for the loading operations. The crane in question was supplied to the shipowner pursuant to a written lease agreement between Prudential Lines and Tidewater.

On the day in question, plaintiff was working as an extra man with a gang of longshoremen furnished by Atlantic and Gulf.[8] The gang carrier was Shaw Amos. Loading operations proceeded without incident during the morning of September 6, 1980. There were two crane operators that day, Eberling and Robert Foreman, both of whom were employed by Tidewater. Eberling and Foreman alternated in their operation of the crane; each man would work an hour and then take an hour off. The longshoremen had stopped for lunch between 12:00 noon and 1:00 p.m., when operations were resumed. After lunch, Eberling was the operator of the crane. The cargo then being loaded into the lash barge consisted of heavy wooden boxes containing disassembled automobile parts known as "knock downs." Each box weighed approximately 2½ tons. Different members of the longshoring gang performed the different loading functions.

After a load had been properly positioned by a forklift tractor, four so-called slingers would attach the cargo to the hook of the Tidewater crane for hoisting from the pier and movement of the load laterally over the barge. On the barge, eight longshoremen would assist in the landing of the drafts of cargo as they came into the barge. Another forklift on the barge would lift and stow each load. Since the crane operator could not see from his position in the crane into the barge, a signalman[9] would station himself on the rudimentary deck of the barge or on the pier so as to be able to look into the barge's hold to see if a load might be safely landed. Appropriate signals would then be given to the crane operator both for moving the hoisted cargo over the proper spot and for lowering the draft into the hold. Taylor was the longshoreman who had been assigned to act as the signalman during the loading operations of September 6, 1980. During the morning hours, he had been positioned on the deck, but he later moved his position off the barge and onto the pier for reasons of safety.

At approximately 1:10 to 1:15 p.m., plaintiff having returned from lunch, descended into the hold of the barge. Shortly after he reached the deck by way of a ladder positioned at the north inshore corner of the barge, he walked across the skin[10] of the barge towards another longshoreman, one Charles Fisher. Plaintiff was then pro-

---

**8.** This gang had been supplied to Prudential Lines for the loading operations pursuant to an oral agreement between these parties.

**9.** Longshoremen also refer to the signalman as the "deckman."

**10.** The floor or bottom of the barge has been termed the "skin" by some of the witnesses.

ceeding from the inshore to the offshore side of the hold. Suddenly and without warning a draft of cargo which was then being lowered into the hold, struck plaintiff and crushed him to the deck. At that particular time, Taylor, the assigned signalman, was neither on the barge nor on the pier. He had left his position on the pier and had walked some twenty to thirty feet south on Pier 10 in order to urinate. Eberling had been operating the crane under a system whereby he would move a draft of cargo over the barge and lower it unless he observed a signal to stop. Seeing no such signal and being in a position where he could not see plaintiff in the center of the barge, Eberling dropped the heavy load directly on top of plaintiff.

Plaintiff was promptly moved by ambulance to the so-called Shock Trauma Unit of the University of Maryland Hospital.[11] His injuries were extensive and included multiple fractures and damage to various internal organs. He spent 133 days in the Shock Trauma Unit and another two months in other hospitals. Not including the emergency measures taken on September 6, 1980, there were some five surgical operations between October 9, 1980 and September 14, 1981. Plaintiff has been unable to return to work and is permanently disabled.

## II

### Negligence

On the record here, this Court finds and concludes that Eberling was negligent in the manner in which he operated the crane on September 6, 1980 and that his negligence was the sole proximate cause of the injuries and other losses sustained by the plaintiffs. Although Eberling was an experienced crane operator, he did not exercise due care when he dropped the load into the hold of the barge without having

received any signal at all that it was safe to proceed.

This Court will credit the testimony of Taylor that he was not in a signaling position on the pier or on the barge when this accident happened.[12] Shortly after lunch, Taylor, who was then stationed on the pier rather than on the barge, walked down the pier to urinate. Even though the assigned signalman was not then on duty, Eberling continued to operate his crane, and observing no signal to stop, lowered this heavy draft of cargo into the barge. Eberling knew that longshoremen whom he could not see were working in the barge. Yet he did not wait for any signal at all from any longshoreman but simply assumed that it was safe to lower the draft in the absence of a signal.

Defendants have introduced evidence indicating that it was the custom of Eberling and of other crane operators in the Port of Baltimore to proceed with loading operations in the absence of a signal. Eberling testified that he did not require an affirmative signal on the part of a deckman before lowering a draft. Rather, he would keep his eyes on the longshoreman assigned to be the signalman, would continue in a rhythmical pattern with the moving and lowering operation and would stop the load during its downward course only if he received an affirmative signal to do so. Whether or not this practice was followed by others in the Port of Baltimore, this Court finds and concludes that it was a negligent method of conducting loading operations of this sort. With six to eight longshoremen stationed in the hold of the barge and with the crane operator positioned in such a way that he could not see where the longshoremen were when he was lowering heavy cargo into the barge, affirmative signals should have been used before cargo was dropped into the hold.[13]

---

**11.** The more precise name of this Unit is the Maryland Institute for Emergency Medicine.

**12.** The testimony of Amos, the gang leader, will be rejected. Throughout his testimony, which was introduced by way of deposition, Amos was

opinionated, hostile and argumentative. What he said is therefore entitled to little credence.

**13.** Standard crane signals, approved for use in the industry, require that a crane operator not carry or lower a load over persons in the ab-

Had Eberling waited for an affirmative signal in this case, no accident would have happened.

Even if the custom and practice relied upon by the defendants might be reasonable under other circumstances, Eberling in any event acted negligently here. Taylor, the signalman who had been on duty all day, was not in position either on the rudimentary deck of the barge or at the place on the pier where he had located himself before the accident happened. Had Eberling been paying attention, he would at the time of this occurrence have noticed that the longshoreman who had been assigned to give him signals and who had been on duty that morning was not in view. Rather, Eberling looked up, observed two other longshoremen standing on the deck at the northwest corner of the barge and mistakenly assumed that one of them was the signalman. In making this erroneous assumption, Eberling did not exercise due care. Quite obviously, it is the responsibility of a crane operator to know which longshoreman has been assigned to act as the signalman. No signals were given to Eberling by either one of these other two longshoremen because neither one of them had been assigned by the gang leader to act as signalman. When he saw no signal given by the longshoreman on the deck assumed to be the signalman, Eberling went ahead and blindly dropped the draft of cargo on top of the plaintiff.

Had Eberling followed a proper signaling procedure, this accident would not have happened. Moreover, even if Eberling had adhered to the improper procedures which he testified he followed, the accident would still not have happened had Eberling not negligently failed to recognize the signalman assigned to act on that particular day. The evidence establishes that in the absence of a signalman in position to give appropriate signals, a crane should not be operated when loads are being carried over longshoremen working in the area. The facts here accordingly show that the negligence of Eberling was the sole proximate cause of the injuries and other losses sustained by the plaintiff on September 6, 1980.

■ This Court further finds that neither Taylor nor any other employee of Atlantic and Gulf was negligent on the day in question. Taylor, the signalman, did not act negligently when he left his post briefly and walked down the pier to urinate. He was absent for only a short period of time and had every right to assume that Eberling would temporarily suspend operations until Taylor had returned to his assigned position. Taylor's acts, in any event, were not a proximate or contributing cause of this accident.

■ Furthermore, neither Frank Cardillo, its terminal manager, nor any other employee of Prudential Lines was negligent on September 6, 1980. Cardillo was not present at the time that the accident occurred. His supervision of the loading operations consisted of an on-site inspection every half hour or so. Eberling was a skilled specialist who was hardly under Cardillo's control when he acted as he did and blindly lowered the draft of cargo into the hold of the barge.

■ On the record here, this Court concludes that there was no breach of duty owed by Prudential Lines to plaintiff. The principles to be applied in a case of this sort involving the duty owed by a shipowner to a longshoreman during loading operations were discussed at some length by the Supreme Court in *Scindia Steam Navigation Co. v. DeLos Santos*, 451 U.S. 156, 101 S.Ct. 1614, 68 L.Ed.2d 1 (1981). During cargo operations, the shipowner has no duty to inspect equipment or supervise the

sence of an affirmative signal. These requirements, designated as U.S.A.S. B 30.5–1968 (the so-called ANSI Standard), were specifically made a part of the agreement between Tide-

water and Prudential Lines covering the lease of this crane. *See also* similar OSHA standards, 29 C.F.R. § 1926.550.

activities of the stevedore.[14] *Id.* at 168–169, 101 S.Ct. at 1622–1623. Once cargo operations have begun, the shipowner may rely on the stevedore and other harborworkers to avoid exposing longshoremen to unreasonable hazards. *Id.* at 170, 101 S.Ct. at 1623. In this case, there were no "obviously improvident" operations which required the shipowner to intervene. See 451 U.S. at 167, 101 S.Ct. at 1622. Cardillo had little to do with the signaling procedures followed by Eberling, and could hardly have prevented this skilled crane operator's unexplained inattention to his assigned duties on the day of the accident. Absent a contractual provision to the contrary, a shipowner has no general duty by way of supervision or inspection to discover dangerous conditions that suddenly develop within the confines of cargo operations. 451 U.S. at 172, 101 S.Ct. at 1624.

## III

### *Contributory Negligence*

Both Prudential Lines and Tidewater contend that plaintiff himself was contributorily negligent at the time of the accident. On the record here, this Court would disagree. Crediting the testimony of plaintiff Henry Krzywicki, this Court finds that plaintiff was not negligent when he proceeded across the skin or bottom of the barge to speak to another longshoreman. It is accordingly concluded that no negligence of the plaintiff caused or contributed to the injuries which he sustained.

Plaintiff had worked on the barge all morning. He was therefore quite aware of the fact that another longshoreman was on duty as a signalman and that, if a load came over the barge while men were underneath, the signalman would be in a position to give a stop signal and prevent the load from being dropped on top of a longshoreman. The draft which struck plaintiff was the second one being loaded after the luncheon break. As plaintiff was com-

ing down the ladder after lunch, the wire which had been removed from the first draft was going up. Plaintiff's testimony indicates that the second draft followed the first in an unusually short period of time.

Plaintiff did not suddenly dart out into the center of the barge's hold at a time when the draft of cargo was already descending. Rather, he was crossing over to the offshore side of the barge at a normal pace when he was struck. His back was to the crane and the incoming load. As he was proceeding to the other side of the barge, plaintiff had every right to rely on his expectation that another draft was not being loaded so soon after the first one and that even if it was, a signalman was on duty to prevent the dropping of the load on top of him. The evidence discloses that there was sufficient time for the load to have been stopped before it struck plaintiff if Eberling had been prudent and waited for a signal. Had Eberling exercised due care, the accident would not have occurred, even though plaintiff was at the time crossing from one side of the barge to the other.

Under somewhat similar circumstances, the Second Circuit in *Falletta v. Costa Armatori*, 476 F.2d 316 (2d Cir.1973) held that a longshoreman could not be held to be contributorily negligent because he failed to stand clear of a danger zone during unloading operations. The District Court's finding to the contrary was reversed. Citing its earlier decision in *Sheehan v. Moore-McCormack Lines, Inc.*, 441 F.2d 360, 363 (2d Cir.1971), the Court recognized in *Falletta* that a longshoreman has a right reasonably to assume that a warning would be given if he were located in a danger zone and that he was under no obligation to anticipate that there would be a failure to fulfill that duty. Similar principles are applicable to the facts of this case.

Accordingly, the Court finds and concludes that plaintiff was not contributorily negligent in the early afternoon of Septem-

---

**14.** The *Scindia* principles are equally applicable to the activities of other harborworkers like Tidewater.

ber 6, 1980, and that no negligence of plaintiff's caused or contributed to his injuries.

## IV

### *The Borrowed Servant Doctrine*

The next question presented in this case is whether defendant Prudential Lines or defendant Tidewater is legally responsible for the negligence of Eberling which was the sole proximate cause of plaintiff's injuries. At the time of this accident, Eberling was employed by Tidewater. However, under the so-called "borrowed servant" doctrine, Prudential Lines would be liable for the tortious conduct of Eberling if Prudential Lines was the special employer of Eberling when the accident happened. *See Sea Land Industries, Inc. v. General Ship Repair Corporation*, 530 F.Supp. 550 (D.Md. 1982).

In *Standard Oil Company v. Anderson*, 212 U.S. 215, 29 S.Ct. 252, 53 L.Ed. 480 (1909), the Supreme Court outlined the principles applicable in a case involving the borrowed servant doctrine. In that case, the Supreme Court said the following at pages 221–222:

> It sometimes happens that one wishes a certain work to be done for his benefit, and neither has persons in his employ who can do it nor is willing to take such persons into his general service. He may then enter into an agreement with another. If that other furnishes him with men to do the work, and places them under his exclusive control in the performance of it, those men become *pro hac vice* the servants of him to whom they are furnished. But, on the other hand, one may prefer to enter into an agreement with another that that other, for a consideration, shall himself perform the work through servants of his own selection, retaining the direction and control of them. In the first case, he to whom the workmen are furnished is responsible for their negligence in the conduct of the work, because the work is his work, and they are, for the time, his workmen. In the second case, he who agrees to furnish the completed work through servants over whom he retains control is responsible for their negligence in the conduct of it, because, though it is done for the ultimate benefit of the other, it is still, in its doing, his own work. To determine whether a given case falls within the one class or the other, we must inquire whose is the work being performed—a question which is usually answered by ascertaining who has the power to control and direct the servants in the performance of their work. Here we must carefully distinguish between authoritative direction and control, and mere suggestion as to details or the necessary cooperation, where the work furnished is part of a larger undertaking.

In Tidewater's pleadings and pretrial briefs and also in the Pretrial Order, Tidewater asserted that Prudential Lines was at the time of the accident the special employer of Eberling and that Prudential Lines was therefore legally responsible for any tortious acts of Eberling. However, in final argument after all the evidence had been presented at the trial, Tidewater's counsel conceded that Tidewater was the general employer of Eberling. In Tidewater's Proposed Findings, its counsel reiterated this changed position and proposed that the Court find that "George Eberling was the general employee of Tidewater."

▮ Although this concession is not necessarily binding on the plaintiffs, it is a significant fact to be considered by the Court in deciding the borrowed servant issue. Tidewater and Prudential Lines now both agree that the lease agreement is not to be interpreted as disclosing any intention of the parties that the crane operator supplied by Tidewater would be the special employee of Prudential Lines. One of the factors to be examined by a court in addressing the borrowed servant issue is whether there was any understanding or meeting of the minds between the original and the borrowing employer as to the status of the employee in question during the period of the employment. *Gaudet v. Exxon Corp.*, 562 F.2d 351, 355 (5th Cir.1977),

*cert. denied* 436 U.S. 913, 98 S.Ct. 2254, 56 L.Ed.2d 414 (1978). That case was cited with approval by the Fourth Circuit in *Huff v. Marine Tank Testing Corp.*, 631 F.2d 1140, 1143 n. 1 (4th Cir.1980).

■ On the record here, this Court finds that Eberling was the servant of his general employer Tidewater at the time of the accident and that Tidewater is therefore legally responsible for Eberling's negligent acts. Eberling was paid by Tidewater, which had the right to discharge him. Eberling had been employed by Tidewater over a considerable length of time, and he had been selected by Tidewater for this particular job. It was Tidewater's crane which was used in the performance of the agreement between Prudential Lines and Tidewater. The employment in question was for a short period of time. Although it was the work of Prudential Lines that was being performed, the latter did not have the power of control over the crane operations itself. Although Frank Cardillo, the terminal manager of Prudential Lines, generally supervised the loading operations of the lash barge on the day in question, Eberling, a skilled crane operator, remained free to operate the crane in accordance with his own judgment when necessary.

■ As mentioned hereinabove, an important factor to consider in deciding a borrowed servant issue is whether there was an agreement between the parties concerning the status of the employee in question. Under both federal and Maryland law, whatever the status of an employee under the "borrowed servant" doctrine, the parties may allocate between themselves the risk of any loss resulting from the employee's negligent acts. *Sea Land Industries, Inc., supra* at 563. In this connection, one of the facts which must be considered is whether one or both parties carried liability insurance which would cover the risk of loss. In this particular case, although both Prudential Lines and Tidewater carry such liability insurance, these parties have agreed that the crane operator Eberling was, during crane operations, to remain the servant of Tidewater, the general employer.

In *Roderick v. Bugge*, 584 F.Supp. 626 (D.Mass 1984), the court had occasion to consider the borrowed servant doctrine in a case in which a longshoreman was injured during the loading of a vessel by a crane. In that case, the crane had been leased to the stevedore pursuant to a written agreement which included the same indemnification clause which is involved here. After weighing all the applicable factors, the Court concluded that the crane operator was not the borrowed servant of the stevedore but was the servant of his employer, the owner of the crane. The Court noted that the vast majority of courts which have evaluated the status of crane operators in analogous circumstances have either ruled that no borrowed servant relationship existed or have reversed directed verdicts that were premised on a finding that such a relationship necessarily existed. 584 F.Supp. 629–630.[15]

Under all the circumstances here, this Court finds and concludes that Eberling was not at the time of the accident the borrowed servant of defendant Prudential Lines, but rather that a master and servant relationship then existed between Eberling and defendant Tidewater. The intention of the parties was that Eberling would remain the servant of Tidewater during the time that the agreement was in existence. This intention is supported by other facts in evidence. Accordingly, Tidewater must be held responsible for the negligent acts of Eberling which caused the injuries sustained by the plaintiff.

## V

*Tidewater's Right to Indemnification*

Relying on the lease agreement entered into with Prudential Lines, Tidewater as-

---

**15.** As the Court in the *Roderick* case pointed out, there would be no need for an indemnification provision in a lease agreement of this sort if the crane operator were intended to be the borrowed servant of the lessee. *See* 584 F.Supp. at 628.

serts that if Eberling was negligent and if Tidewater is legally responsible for his negligence, then Prudential Lines is required by the agreement to indemnify it for any loss sustained. To decide this question, the Court is here called upon to interpret the provisions of the written agreement between the parties.

Among the terms and conditions applicable to the leasing by Prudential Lines of a Tidewater crane on September 6, 1980, is the following:

> 2. *Indemnification:* Lessee agrees that the equipment, and all persons operating such equipment, including Lessor's employees, are under Lessee's exclusive jurisdiction, supervision and control and agrees to indemnify and save Lessor, its employees and agents harmless from all claims for death or injury to persons, including Lessor's employees, and from all loss, damage or injury to property, or its loss of use including the equipment, arising in any manner out of Lessee's operation. Lessee's duty to indemnify hereunder shall include all costs or expenses arising out of all claims specified herein, including all court and/or arbitration costs, filing fees, attorneys' fees and costs of settlement. Lessee shall not be required to indemnify Lessor for its sole negligence except for loss of use, but, Lessor's liability for damage caused by the sole negligence of Lessor, its agents and employees, hereunder shall be limited to the amount of Lessor's liability insurance.

 The interpretation of an indemnity clause as part of a maritime contract is a matter governed by federal maritime law. *Navieros Oceanikos, S.A. v. S.T. Mobil Trader,* 554 F.2d 43, 47 (2d Cir.1977). The evidence here discloses that the printed portions of this agreement were prepared by Tidewater. The traditional rule of construction applied in admiralty cases is that where a contract is ambiguous and susceptible to reasonable and practical interpretations, the language must be construed most strongly against its drafter. *Navieros Oceanikos, supra* at 47; *American*

*Export Isbrandsten Lines, Inc. v. United States,* 390 F.Supp. 63, 66 (S.D.N.Y.1975).

 That there are inconsistencies in the language of this indemnification clause is apparent. In the first sentence, Prudential Lines agrees to indemnify and hold Tidewater harmless "from all claims for death or injury to persons, ... arising in any manner out of [Prudential Lines'] operation." However, the third sentence contains limiting language. Pursuant to the third sentence, Prudential Lines "shall not be required to indemnify [Tidewater] for its sole negligence ..., but, [Tidewater's] liability for damage caused by the sole negligence of [Tidewater], its agents and employees hereunder shall be limited to the amount of [Tidewater's] liability insurance." Tidewater places heavy reliance on the broad language of the first sentence in arguing that Prudential Lines is here required to indemnify it for any liability found by this Court to exist because of the negligence of Eberling. Prudential Lines in turn argues that if the loss here was caused by the sole negligence of Eberling, Tidewater's employee, the third sentence is controlling, and that since Tidewater has sufficient liability insurance, it must be held responsible for the damage caused by Eberling's negligent acts.

Based on the findings made herein, this Court concludes that Prudential Lines is not required by the indemnification clause of the lease agreement to indemnify Tidewater for the loss resulting from Eberling's negligence. As the Court has found, it was Eberling's sole negligence which was the proximate cause of plaintiff's injuries. Plaintiff himself was not contributorily negligent nor did any negligence of Taylor or Prudential Lines contribute to this accident. The broad language of the first sentence of the indemnification clause is limited by the third sentence which clearly indicates that Prudential Lines would not be required to indemnify Tidewater if Tidewater's sole negligence caused the loss.

Indeed, Tidewater has not seriously challenged this construction of the indemnification clause of the agreement. In one of its

briefs, Tidewater asserts that the third sentence was "obviously inserted into the clause" to comply with the provision of Maryland law which renders void and unenforceable any indemnity provision in a construction contract which purports to indemnify the indemnitee against liability for damages arising out of bodily injury resulting from the indemnitee's sole negligence. *See* Annotated Code of Maryland, § 5–305, Cts. & Jud.Proc. Art. Tidewater argues that, if Eberling is found to have been negligent, it is entitled to indemnification from Prudential Lines because it was not Eberling's sole negligence which caused the accident. Tidewater contends that if negligence of any other party contributed to the accident, then it is entitled under this agreement to full indemnity from Prudential Lines.

Although not necessary under the facts of this case to reach this issue, the Court cannot agree that any degree of negligence on the part of plaintiff or on the part of another longshoreman would shift total responsibility for the loss to Prudential Lines. Rather, under the indemnification clause, if Tidewater's sole negligence caused a loss during crane operations, Prudential Lines would be relieved of its duty to indemnify Tidewater which would then be responsible to the limits of its liability insurance.[16] If negligence of Prudential Lines contributed to such a loss and if Tidewater were held legally responsible in whole or in part, then Prudential Lines would be required to indemnify Tidewater for the entire amount of the loss sustained whether or not Tidewater was also negligent. Here there was no negligence of Prudential Lines which caused or contributed to the accident. Moreover, there was no negligence of plaintiff or any other longshoreman which caused or contributed to the loss. Since Tidewater's sole negligence was the proximate cause of the loss and since Tide-

water's liability insurance coverage is sufficient to pay the entire amount of the award to the plaintiffs in this case, Tidewater is not entitled to indemnification from Prudential under the terms of the agreement between the parties.[17]

## VI

### *Damages*

That plaintiff's injuries were extensive is clear. Indeed, it is something of a minor miracle that he is still alive after being crushed by the weight of the heavy load which was dropped on him while he was working on this lash barge on September 6, 1980. When the draft of cargo was lifted from his body, plaintiff became blue and was gasping for breath. He was removed by a basket and taken by ambulance to the Shock Trauma Unit of the University of Maryland Hospital. He spent some 133 days in the Shock Trauma Unit before being removed to North Charles General Hospital. Since the accident occurred, plaintiff has been hospitalized in all for some 200 days.

An emergency team of surgeons worked on plaintiff when he was first brought to the Shock Trauma Unit. There were multiple rib fractures and a fractured sternum, and his right lung had collapsed. He had suffered a fractured pelvis and his urethra was ruptured. Because of these multiple injuries, he was in shock when the Shock Trauma team worked on him. Emergency procedures were undertaken, with success, to keep plaintiff alive.

In the days after the accident when his condition had been stabilized, there were numerous complications. Plaintiff suffered from renal and pulmonary failure; he also had gastro intestinal bleeding. Numerous surgical procedures were necessary, including stabilization of his pelvic fracture and the insertion of Hoffmann

---

**16.** An identical indemnification clause was similarly construed in *Roderick v. Bugge, supra* at 629.

**17.** Prudential Lines has also contended that, because of Tidewater's superior bargaining posi-

tion, the indemnification clause is void as contrary to public policy. Although the evidence produced at trial indicates that there is little merit to that contention, it is not necessary for the Court to rule on this question.

pins, removal of his gall bladder, a bronchoscopy, and the opening of a pericardial window below the rib cage. During the time that plaintiff was confined in the Shock Trauma Unit, he was a critically ill person, and his hospital course was complicated. According to the hospital notes, plaintiff did make a remarkable recovery insofar as his renal failure and coagulopathy were concerned. Finally, after extensive treatment, he was discharged on January 17, 1981 and transferred to North Charles General Hospital for intensive physical therapy.

At North Charles General, plaintiff was treated by Dr. Joel Cherry for his urinary problems and by other physicians for abdominal, tracheal, cardiac and orthopedic complaints. As a result of the accident, plaintiff was rendered impotent. Because of his pelvic fracture and the tearing of his urethra, a massive abscess developed in his bladder, and he was incontinent. According to Dr. Cherry, his impotency is permanent. However, plaintiff was treated with some success for his incontinency. Because of intermittent bowel obstruction, an abdominal operation was performed, and he underwent removal of a cyst and the lysis of adhesions. On March 14, 1981, plaintiff was discharged from North Charles General Hospital.

Since March of 1981, plaintiff has undergone a program of rehabilitation under the treatment of Dr. Norman Rosen. Among other complications noted by Dr. Rosen was generalized thickening and enlargement of plaintiff's vocal cords. On September 13, 1981, plaintiff was admitted to Greater Baltimore Medical Center. He was operated on by Dr. Ury Kallayee, who excised a nodule from plaintiff's right vocal cord and later performed nasal surgery for a deviated septum. Plaintiff was discharged from that hospital on September 30, 1981. Since the accident, plaintiff has been extremely hoarse, and his hoarseness was quite evident when he testified at the trial. Dr. Rosen also treated plaintiff for persistent back pain and for pain in his chest wall, shoulder and abdominal region. Treatment consisted of massage, injections and medication. In spite of this lengthy program of rehabilitation and counseling, plaintiff experienced periods of depression. His impotency was particularly frustrating to him.

On March 1, 1983, plaintiff was once again admitted to North Charles General Hospital. According to the hospital notes, he had been relatively well since his discharge in January of 1981 but was re-admitted because of complaints of chest, hip and lower back pain as well as bladder and groin pain. His treatment consisted of medical and physical therapy, and he was discharged on March 12, 1983.

Plaintiff was born in Poland and came to the United States in 1950. His left arm, which had been broken before he came to this country, was somewhat deformed. Nevertheless, plaintiff had been actively employed all of his life. He began working as a longshoreman in 1962, and he had averaged approximately 2,000 hours of work a year. In 1979, he strained his back while working and missed some 6 to 7 weeks. Also, in that year he was out of work for a period of time because of pneumonia. In 1980, he was injured when struck by a tractor driver and suffered a permanent partial disability to his right foot. On this occasion, he was off work for some 6 to 7 weeks.

Before the accident of September 1980, plaintiff had worked around the house and done minor repairs. Since his discharge from North Charles General Hospital in 1981, plaintiff has not been able to work around the house at all. Plaintiff uses a cane when walking and moves very slowly. According to his son, Richard Krzywicki, plaintiff has since the accident been very moody and depressed.

The life expectancy of a white male born on September 15, 1919 is 14 years. Plaintiff is permanently disabled from any work in the future. Moreover, his injuries are permanent and his physical condition will probably not improve during the remaining years of his life. Allowable medical expenses in this case are $237,963. In addi-

tion, plaintiff is entitled to lost earnings until age 62. The evidence discloses that when the accident occurred on September 6, 1980, it was plaintiff's intention to work only until he was 62 years of age. His testimony at trial that he had now changed his mind and would have worked until age 65 will not be accepted by the Court. The amount allowed for his lost earnings is therefore $31,000. No amount will be awarded for future medical expenses. The proof has not been sufficiently particularized to establish plaintiff's entitlement to this item of damages.

The most substantial item of damages claimed by plaintiff in this case is the recovery he seeks for past and future pain, suffering and emotional distress. On the one hand, this Court must consider the many hospitalizations, operations and medical treatment that plaintiff has endured over the past four years since the accident. During the periods of his hospitalizations, treatments and rehabilitation and since he has returned to his home, plaintiff has undoubtedly experienced considerable pain and mental anguish. He walks with some difficulty, and it is not expected that his physical condition will improve in the future.

On the other hand, plaintiff, at age 60, was no longer a young man and would have stopped working in any event in September of 1982. In light of the severity of his multiple injuries, plaintiff's recovery, resulting obviously from modern medical techniques of treatment, has been remarkable. Even before this accident occurred, plaintiff had a deformed left arm, and he had suffered earlier employment injuries, including a permanent partial disability to his right foot.

On the record here, this Court is satisfied that plaintiff is entitled to a substantial award for pain and suffering. When all the factors here are weighed, the Court finds and concludes that an appropriate award for plaintiff's past and future pain, suffering and emotional distress and for his permanent disability is $600,000. The

total award to plaintiff individually is therefore $868,963.

Finally, there is a joint claim asserted in this case on behalf of plaintiff and his wife for loss of consortium. As a result of the accident, plaintiff is now impotent. However, he is now 65 years of age and he has declined to submit to an operation which would provide him with a penile implant. Were he to consent to such a procedure, he would be able to resume sexual relations with his wife. In view of plaintiff's age and in view of the fact that he has declined to take steps necessary for a resumption of reasonably normal sexual relations, this Court concludes that an appropriate award in this case for past and future loss of consortium is $25,000.

## VII

### *The Cross Claim of Prudential Lines Against Tidewater*

██ As a result of this Court's finding that the sole negligence of Tidewater caused plaintiff's injuries, one additional issue must be addressed. Asserting that it would be entitled to indemnity if the sole negligence of Tidewater caused this loss, Prudential Lines has cross claimed against Tidewater seeking to recover attorneys' fees and other costs incurred in defending this suit. Relying on *Ryan Stevedoring Company v. Pan Atlantic Steamship Corp.*, 350 U.S. 124, 76 S.Ct. 232, 100 L.Ed. 133 (1956), Prudential Lines contends that because of the actions of its employee Eberling, Tidewater breached the implied warranty of workmanlike performance which purportedly arose pursuant to the lease agreement between the parties.

However, as this Court previously noted in its Memorandum and Order of September 6, 1983, the 1972 Congressional amendments of the Longshoremen's and Harbor Workers' Compensation Act, (hereinafter "the Act"), 33 U.S.C. § 901, *et seq.*, prohibited recovery by a shipowner from a stevedore under both a *Ryan* contract theory of warranty of workmanlike performance and in tort. In that Memorandum and Order, this Court dismissed Tidewater's third-par-

**644**

ty claim asserted in this case against plaintiff's employer, Atlantic and Gulf, holding that an indemnity action cannot be brought by a non-vessel against a stevedore.

For similar reasons, this Court concludes that Prudential Lines, a shipowner, is not entitled to seek indemnity from Tidewater, a non-vessel. In its prior ruling in this case, this Court placed heavy reliance on the opinion of Judge Friendly in *Zapico v. Bucyrus-Erie Co.*, 579 F.2d 714 (2d Cir. 1978). In concluding that the 1972 amendments to the Act gave shipowners a *quid pro quo* for the loss of their indemnity rights, the Second Circuit in *Zapico* said the following (579 F.2d at 731):

> The 1972 amendments eliminated the unseaworthiness theory and limited vessel liability to negligence in exchange for the surrender of the vessel's indemnity rights. *See* H.R.Rep. No. 1441, *supra*, 3 U.S.Code & Cong. & Admin.News 4698 at 4701–05 (1972)....

 This Court concludes that such loss of indemnity rights extends both to claims by a vessel owner against a stevedore and to claims by a vessel owner against an employer of a harborworker like Tidewater. It was the obligation of the shipowner to provide a seaworthy vessel which gave rise to the implied warranty of workmanlike performance recognized in *Ryan*. In *Ryan*, the Supreme Court sought to mitigate the severity of the unseaworthiness doctrine, a form of strict liability, by permitting the shipowner to seek indemnity from an independent contractor whose activities may have resulted in the shipowner's liability to an injured individual. *See Stranahan v. A/S Atlantica & Tinfos Papirfabrik*, 521 F.2d 700, 703 (9th Cir.1975). Once the unseaworthiness doctrine was eliminated by the 1972 amendments to the Act, there is no longer any reason for allowing the shipowner to seek indemnity, either from the stevedore or from any other employer of a harbor-

worker. Accordingly, the cross claim of Prudential Lines asserted against Tidewater must be dismissed.[18]

 In any event, even were this Court to conclude that Prudential Lines would be entitled to assert a claim for indemnity against Tidewater, no recovery for attorneys' fees and costs would be permitted under the facts of this particular case. All, or substantially all, of the expenses incurred by Prudential Lines in this case were devoted to defending against Tidewater's claim against it for indemnity based on the lease agreement between the parties. Most of the time spent by counsel for Prudential Lines in this case was devoted to defending against the indemnity claim asserted by Tidewater against it. Any remaining time and expense which might be deemed to have been devoted to defending against plaintiffs' direct claims against Prudential Lines overlapped with that necessary for Prudential Lines to defend against Tidewater's cross claim. Under the lease agreement, if negligence of Prudential Lines caused or contributed to the accident, then Tidewater would have been entitled to full indemnification, since the loss would then not have been caused by the sole negligence of Tidewater. Whether or not plaintiffs had named Prudential Lines as a defendant in this case, Tidewater would certainly have brought Prudential Lines in as a third-party defendant in view of the indemnification clause in the agreement.

 The general rule in the United States is that absent statute or enforceable contract, a litigant must pay its own attorneys' fees. *Alyeska Pipeline Service Co. v. The Wilderness Society*, 421 U.S. 240, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975). The facts of this case do not disclose any reason for departing from this well-established principle. Accordingly, Prudential Lines will here be required to pay its own attorneys' fees and costs.

---

18. Furthermore, Prudential Lines would not be entitled to seek indemnity from Tidewater under a theory of contract inasmuch as the lease agreement between the parties contained no express provision requiring indemnification of Prudential Lines under circumstances such as those present in this case.

## VIII

### *Conclusion*

For the reasons stated, plaintiff Henry T. Krzyuwicki is entitled to judgment in this case against defendant Tidewater and against third-party defendant Eberling in the amount of $868,963, plus costs. Plaintiffs Henry T. Krzywicki and Anna Krzywicki jointly are entitled to judgment against defendant Tidewater and against third-party defendant Eberling in the amount of $25,000, plus costs. Judgment is hereby entered in favor of defendant Prudential Lines against plaintiffs. The third-party claim of defendant Prudential Lines against defendant Eberling is hereby dismissed as is the cross claim of defendant Prudential Lines against defendant Tidewater. Judgment is hereby entered in favor of defendant Prudential Lines as to the cross claim asserted by defendant Tidewater and also as to the cross claim asserted by third-party defendant Eberling. The Clerk is directed to enter these judgments.